2020 IL App (1st) 190778

FIRST DISTRICT
FOURTH DIVISION
September 10, 2020

No. 1-19-0778

|  | ) | Appeal from the |
|---|---|---|
| THOMAS ITTERSAGEN, | ) | Circuit Court of |
|  | ) | Cook County |
| Plaintiff-Appellant, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | No. 16 L 3532 |
| ADVOCATE HEALTH AND HOSPITALS | ) |  |
| CORPORATION D/B/A ADVOCATE MEDICAL | ) |  |
| GROUP and ANITA THAKADIYIL, M.D., | ) |  |
|  | ) | Honorable |
| Defendants-Appellees. | ) | Rena Van Tine, |
|  | ) | Judge Presiding. |
|  | ) |  |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff Thomas Ittersagen brought a medical malpractice action in the circuit court of

Cook County naming as defendants Advocate Health and Hospitals Corporation d/b/a Advocate

Medical Group (Advocate Medical) and Dr. Anita Thakadiyil.  Plaintiff claimed that defendants

were negligent when Dr. Thakadiyil failed to diagnose him with sepsis, failed to refer him to the

emergency room for treatment, and by performing an incision and drainage in an outpatient

setting without first administering intravenous fluids and antibiotics.  Plaintiff further claimed

that defendants' negligence caused bacteria and toxins to enter his system and toxic shock syndrome to develop, resulting in a below the knee amputation of both legs. After a jury trial, the trial court entered judgment on the jury's verdict in favor of defendants. Plaintiff now appeals, arguing the trial court committed numerous errors including: (1) failing to dismiss a juror for cause; (2) granting a motion *in limine* preventing one of his experts from testifying as to Dr. Thakadiyil's standard of care; and (3) allowing defendant's expert to testify about his personal practices despite a motion *in limine* prohibiting such testimony. Plaintiff further argues that he was prejudiced by certain statements made by defense counsel during closing argument. For the reasons that follow, we affirm.[1]

¶ 2                          BACKGROUND

¶ 3                          Motion to Strike

¶ 4      Prior to setting forth the facts of this case, we briefly address defendants' motion to strike plaintiff's statement of facts as set forth in their brief. Defendants argue that plaintiff's statement of facts violates Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018), which requires that the statement of facts "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." According to defendants, plaintiff's statement of facts is argumentative, inserts matters that are of no relevance to this court's consideration of the issues, and results in a skewed and inaccurate presentation of the facts of the trial.

¶ 5      While defendants strenuously argue that plaintiff's statement of facts should be stricken

---

[1] This decision was initially filed in May 2020 with Justice Burke as a member of the panel. Subsequently, Justice Burke recused and the previous decision was withdrawn. This new opinion is now being filed with Justice Gordon as the new panel member. Justice Gordon has read the briefs, record, and filings in this case, and has concurred with the majority opinion.

(indeed five pages of their brief address this subject), we note that defendants themselves failed to set forth an appropriate statement of facts before this court. They too have essentially utilized the statement of facts section of their brief to argue instead of bringing a separate motion to strike. Accordingly, this court has not been provided an appropriate statement of facts from either party.

¶ 6    This court may strike a statement of facts when the improprieties hinder our review. *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009). We are also within our rights to dismiss an appeal for failure to provide a complete statement of facts. *Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co.*, 356 Ill. App. 3d 471, 478 (2005). Here, the medical malpractice case, which was conducted over numerous days, involved multiple expert witnesses and technical subject matter. This was not a simple, straightforward case. Indeed, our review of the record reveals that this court was not provided with reports of proceedings from numerous days of the trial, including jury selection, which is relevant to our decision. Plaintiff's appendix further relied on the circuit court of Cook County's general statement of the contents of the record to create a table of contents. For example, it merely identifies in which portion of the record a "hearing" occurs, but does not indicate which witnesses testified that day. This general statement does not accurately identify the nature of the proceedings below and does not assist us in our review of the voluminous record.

¶ 7    Despite the fact we lack an appropriate statement of facts, we decline to grant the defendants' motion. As noted, the record is not complete and thus the absence of any pertinent portion of the record will be construed against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). We do, however, have enough of the trial record to render determinations on the issues presented. Accordingly, we now turn to set forth those facts pertinent to this appeal. We

note that the omission of any facts one would expect to find in a review of a medical malpractice action (*e.g., voir dire*, the testimony of plaintiff and his family members, and evidence regarding the damages sustained) is due to plaintiff's failure to provide us with a sufficient record.

¶ 8                                          Pretrial

¶ 9      The record demonstrates that this matter was contentiously litigated.  The parties raised numerous motions *in limine* prior to trial.  Of those motions *in limine*, only two are pertinent to this appeal.  The first motion *in limine* in contention involved defendants' request to bar Dr. Hogarth, a pulmonologist and critical care expert, from rendering opinions as to the standard of care as it applied to Dr. Thakadiyil, a family practice physician.  After hearing lengthy argument from counsel, the trial court granted the motion *in limine* and barred Dr. Hogarth from rendering an opinion on Dr. Thakadiyil's standard of care.  The trial court, however, stated it would allow Dr. Hogarth to testify about his familiarity and diagnosis of sepsis, that plaintiff had sepsis at time of the office visit, that the incision and drainage procedure worsened plaintiff's condition, and that Dr. Thakadiyil's treatment caused plaintiff's injury.  The trial court also granted defendant's motion *in limine* and did not allow personal practice testimony from any of the witnesses on direct.

¶ 10                                         Trial

¶ 11      The matter then proceeded to a jury trial where the following evidence was adduced.  On July 8, 2010, at 11 a.m., plaintiff, a diabetic, was seen by Dr. Thakadiyil, a family practice physician, at her office.  Plaintiff's chief complaint was a carbuncle (an infection of the hair follicles) in his left armpit, body aches, and a general unwell feeling.  Plaintiff's vital signs were taken by a medical assistant.  He had a fever of 101.1, a heart rate of 112, a respiratory rate of 14, and a blood pressure of 102/68.  Dr. Thakadiyil then conducted an overall physical examination

of plaintiff and discussed with plaintiff his medical history and current condition. Plaintiff's medical chart revealed a history of elevated heart rate with infection. After considering plaintiff's entire clinical presentation and medical history, Dr. Thakadiyil determined the best course of action was to perform an incision and drainage on the carbuncle. With plaintiff's permission she made a small incision in the carbuncle with a scalpel, drained the carbuncle of pus, took a culture of the infected area, and packed and dressed the wound. Dr. Thakadiyil wrote plaintiff a prescription for Bactrim, an oral antibiotic, and instructed him to follow up with her in 48 hours.

¶ 12     After plaintiff left Dr. Thakadiyil's office, he went to Walgreens to have the prescription filled. Then, instead of waiting for the prescription at the pharmacy, plaintiff went to Burger King for lunch. While at Burger King plaintiff vomited and began feeling more unwell. He then went home.

¶ 13     At 2 p.m., plaintiff went to the emergency room at Riverside Medical Center. At that time, plaintiff's heart rate was 162 beats per minute, his blood pressure was 98/54, his respiratory rate was 22, and he had a fever of 103.2 degrees. Plaintiff was experiencing nausea, vomiting, headaches, and abdominal pain. Plaintiff was in septic shock and treated with intravenous fluids and the antibiotic vancomycin. At 8 p.m., plaintiff's condition worsened. Lab results revealed that he was experiencing renal failure and he was put on vasopressors to maintain his blood pressure. He was put on a ventilator at 10 p.m. and at 12 a.m. he began dialysis.

¶ 14     The following day, plaintiff was formally diagnosed with toxic shock syndrome. By 11 a.m., the oxygen saturation level in his feet was 12% and they appeared dusky in color and were cold. That afternoon, plaintiff's condition began to improve, however, his legs developed gangrene and had to be amputated below the knee.

¶ 15                          *Plaintiff's Expert Witnesses*

¶ 16     Regarding a family practice physician's standard of care, plaintiff introduced the expert testimony of Dr. Bernard Ewigman, a family practice physician. Upon his review of the medical records and depositions in this case, Dr. Ewigman opined that Dr. Thakadiyil deviated from the standard of care in two ways: (1) when she failed to diagnose plaintiff with sepsis and (2) when she performed the incision and drainage procedure and sent plaintiff home instead of to the emergency room. According to Dr. Ewigman, plaintiff's presentation of symptoms at 11 a.m. demonstrated that plaintiff was suffering from a systemic infection and should have raised concerns in Dr. Thakadiyil that plaintiff had sepsis. Dr. Ewigman explained that, at the time Dr. Thakadiyil treated plaintiff, the medical community was guided by the systemic inflammatory response syndrome (SIRS) criteria to determine whether an individual had sepsis. The SIRS criteria are as follows: (1) heart rate above 90 beats per minute; (2) respiratory rate above 20; (3) temperature above 100.9; and (4) a white blood cell count. If two of the criteria are positive in the presence of an infection or suspected infection, then a physician must investigate further to rule out sepsis. Here, where plaintiff was a diabetic with a carbuncle and systemic issues, the standard of care required that sepsis must be considered and ruled out.

¶ 17     On cross-examination, Dr. Ewigman testified that plaintiff was alert, oriented, had normal respirations, and a systolic blood pressure above 90 when he was treated by Dr. Thakadiyil. Dr. Ewigman further testified that plaintiff's medical history demonstrated he had previously exhibited at least two of the SIRS criteria in an outpatient setting on numerous occasions but did not have sepsis. Dr. Ewigman also testified that sepsis is not common in the outpatient setting.

¶ 18     Dr. Douglas Kyle Hogarth, a board-certified pulmonologist and critical care specialist,

testified as plaintiff's expert regarding causation. As a critical care specialist, Dr. Hogarth testified he treated thousands of sepsis patients. Based on his education, training, and experience as well as the medical records, depositions, and medical literature, Dr. Hogarth opined that plaintiff was septic when he was seen by Dr. Thakadiyil and the incision and drainage she performed worsened plaintiff's condition by releasing bacteria and products into his blood stream ultimately caused him injury. Dr. Hogarth based his opinion that plaintiff had sepsis when seen by Dr. Thakadiyil on the fact that plaintiff met two of the SIRS criteria (fever and heart rate) and had an infection (the carbuncle).

¶ 19    Dr. Hogarth further opined that if plaintiff had received intravenous fluids and antibiotics prior to the incision and drainage procedure being performed, he would not have developed this course of septic shock and toxic shock. Dr. Hogarth explained that if plaintiff had not developed septic shock, he would not have had bilateral amputations.

¶ 20    On cross-examination, Dr. Hogarth testified that he does not perform incision and drainage procedures. Dr. Hogarth also acknowledged that the carbuncle was present for five to seven days prior to seeing Dr. Thakadiyil. Dr. Hogarth opined that if plaintiff had been seen by a physician before sepsis onset, the injury potentially would not have occurred.

¶ 21    Dr. Paul Collier, a board-certified vascular surgeon, testified as one of plaintiff's retained experts. Based on plaintiff's medical records and the other documents in this case, Dr. Collier opined to a reasonable degree of medical certainty that plaintiff did not have any significant vascular disease prior to July 8, 2010. In rendering this opinion, Dr. Collier did take into account the fact that plaintiff was a 31-year-old smoker with a four-year history of diabetes.

¶ 22    Dr. Collier further opined that plaintiff lost his legs because he had a profound state of shock and had prolonged treatment with vasopressors, drugs that constrict blood vessels thereby

reducing the amount of blood to the extremities. Dr. Collier explained that this restriction of blood flow to the extremities led plaintiff to develop blood clots and ultimately develop gangrene in both legs. According to Dr. Collier, had plaintiff not gone into shock and been placed on vasopressors he would not have lost his legs.

¶ 23 Dr. Anita Thakadiyil testified as an adverse witness that she has been a board-certified family medicine physician since 2006. The first and only time she treated plaintiff was on July 8, 2010. On that day, plaintiff presented with a .5 cm carbuncle, a soft tissue infection of hair follicles, body aches, and a general unwell feeling. Her observations of plaintiff revealed the plaintiff was alert, oriented, and, while his heart rate was elevated, he had regular vital signs. Dr. Thakadiyil also reviewed plaintiff's medical history and noted that he was a diabetic. As a diabetic, plaintiff was more at risk for severe infections. Dr. Thakadiyil performed an incision and drainage procedure on plaintiff. This involved a superficial incision into the carbuncle, excising the pus, and then packing and dressing the wound with gauze. Dr. Thakadiyil also took a culture of the carbuncle which was submitted to a lab for further testing. At no point did Dr. Thakadiyil suspect sepsis.

¶ 24 Dr. Thakadiyil further testified that while plaintiff met some of the SIRS criteria on July 8, 2010, this criteria consists of "general variables" for sepsis and does not account for a patient's history and physical presentation. Dr. Thakadiyil testified she ruled out sepsis based on his history, physical presentation, and vital signs. Had she suspected sepsis she would have sent plaintiff to the emergency room.

¶ 25 On cross-examination, Dr. Thakadiyil testified that most patients with the flu meet the SIRS criteria, as well as those with skin infections and strep throat. These patients make up 80-90 percent of her practice. She does not send them all to the emergency room.

¶ 26    Patrick Schlievert, Ph.D., testified as plaintiff's expert in microbiology and immunology. Schlievert testified that he is the world expert on toxic shock syndrome and has authored 450 articles on the subject. Schlievert opined to a reasonable degree of microbiology certainty that when plaintiff's carbuncle (a typically low-oxygen environment) was opened and exposed to oxygen the toxin production rapidly increased causing plaintiff's toxic shock syndrome. Pursuant to his calculations, Schlievert opined to a reasonable degree of microbiology certainty that plaintiff had a deadly dose of toxins in his blood stream between 11:20 a.m. and 2 p.m. on July 8, 2010.

¶ 27    On cross-examination, Schlievert testified that it is unknown if hemoglobin has an effect on toxin production. According to Schlievert, if the particular toxin that was in plaintiff's blood is exposed to hemoglobin it "may be" able to multiply. Schlievert further acknowledged that while, in his opinion, plaintiff had 20,000 times the lethal dose of toxin in his blood stream at 2 p.m., plaintiff was still alert, oriented, talking, and had a normal blood pressure.

¶ 28                    *Defendants' Expert Witnesses*

¶ 29    Dr. Thakadiyil testified again during her case-in-chief regarding her treatment of plaintiff and her opinion that she followed the standard of care of a reasonably well-trained family medicine physician. On July 8, 2010, plaintiff had been a patient of Advocate Medical, however, he had not been seen by her previously. Plaintiff's chief complaint was that he had tender nodules in the left axilla that had previously drained pus. Dr. Thakadiyil inquired whether plaintiff had experienced any chest pain, shortness of breath, pain in his joints, or headache. Plaintiff responded he had not. Dr. Thakadiyil then conducted a physical examination of plaintiff, finding two cyst-like nodules side-by-side in his left underarm. Based on the responses to his inquiries and her physical examination, Dr. Thakadiyil diagnosed plaintiff with a carbuncle

and uncontrolled diabetes. Plaintiff recommended that the best treatment was for him to have the carbuncle drained. Draining the carbuncle would get rid of the source of the infection. Plaintiff agreed. Dr. Thakadiyil cleaned the carbuncle with an alcohol swab, made a vertical incision with a scalpel, drained the pus, put packing in, took a swab of the area, and placed a dressing on the wound. She then provided plaintiff with a prescription for Bactrim, an oral antibiotic.

¶ 30    Dr. Marc Dorfman, a board-certified emergency medicine physician, testified as defendants' retained expert. Based on his review of the records in this case as well as his knowledge, training, and experience, Dr. Dorfman testified that Dr. Thakadiyil's care was appropriate and did not cause plaintiff's injury. According to Dr. Dorfman, had plaintiff been seen in an emergency room setting with the same vital signs, fever, and complaint of a carbuncle at 11 a.m. on July 8, 2010, the treatment would have been the same as the treatment Dr. Thakadiyil provided. No intravenous fluids or antibiotics would have been administered to plaintiff and he would have been discharged with a prescription for an antibiotic. Dr. Dorfman further testified that if plaintiff had come into the emergency room with a diagnosis of sepsis his treatment would have been the same. Dr. Dorfman also testified that the hypothetical administration of intravenous fluids and antibiotics at 11 a.m. would not have changed the outcome in this case because plaintiff received such fluids and antibiotics within three hours.

¶ 31    On cross-examination, Dr. Dorfman admitted that plaintiff had two out of the four SIRS criteria and an infection. Dr. Dorfman explained, however, that there was a question if plaintiff had sepsis at 11 a.m. because there was no direct explanation for the cause of his fever; the fever could have been caused by his elevated heart rate or by the infection. Dr. Dorfman further explained that he based his opinion that plaintiff did not have sepsis when seen by Dr. Thakadiyil on the fact that plaintiff was able to walk into the office, leave the office, and go to Burger King

thereafter as well as the fact that Dr. Thakadiyil found the source of the infection.

¶ 32    Dr. William Schwer, a board-certified family practice physician, testified regarding Dr. Thakadiyil's standard of care.  According to Dr. Schwer, based on his review of the records in this case, along with his knowledge and experience as a family practice physician, Dr. Thakadiyil met the standard of care in her diagnosis and treatment of plaintiff.  Dr. Schwer testified that it is very common for family practice physicians to see patients with elevated heart rates and fevers in the office setting.  Dr. Schwer also opined that plaintiff did not have bacteria in his blood at 11 a.m. because he did not look toxic, had a low-grade fever, and his vital signs were stable.

¶ 33    Dr. Schwer further opined that Dr. Thakadiyil did not need to include sepsis in her differential diagnosis of plaintiff based on his overall clinical presentation and medical history. Dr. Thakadiyil's treatment of plaintiff was proper and she had no reason to send plaintiff to the emergency room.  The standard of care also did not require Dr. Thakadiyil to administer intravenous fluids and antibiotics prior to the incision and drainage procedure.

¶ 34    On cross-examination, Dr. Schwer defined sepsis as the presentation of a significant fever, neurological changes, confusion, fatigue, rapid heart rate, and low blood pressure.  Dr. Schwer also explained that the SIRS criteria were for screening patients who might be at a higher risk for sepsis, not diagnosing sepsis.

¶ 35    Dr. Fred Zar, a physician board-certified in infectious disease and internal medicine, testified as follows.  Dr. Zar opined that when Dr. Thakadiyil treated plaintiff he had a localized infection and did not have sepsis.  Dr. Zar based this opinion in part on plaintiff's normal blood glucose reading that morning.  In people with diabetes, blood sugar increases when hormones are released to fight infection.  Plaintiff had normal blood pressure and his medical history

demonstrated that when he had infections in the past his heart rate was a similar rate. This opinion was further based on the fact that plaintiff did not demonstrate abdominal pain, headache, chills, or vomiting at the time of the office visit. Had plaintiff exhibited such symptoms it would have indicated that bacteria had entered his blood stream.

¶ 36   Dr. Zar further explained that the SIRS criteria is not a diagnosis for sepsis, it is a research definition that was developed to see if, by just looking at vital signs, a physician would be able to predict who would have a serious infection. In the early 2000s, a study demonstrated that the SIRS criteria were of no benefit. Thereafter, the SIRS criteria turned out not to be reliable, so societies began abandoning its use.

¶ 37   Dr. Zar further opined regarding the incision and drainage procedure. According to Dr. Zar, the incision and drainage procedure is very common, and he had even performed one on his daughter when her belly button piercing had become infected.[2] The purpose of the incision and drainage procedure is to control the source of infection. By draining the area, one is able to remove most of the bacteria but not all. Antibiotics are then prescribed to treat the remaining infection and kill the bacteria. Incision and drainage procedures are performed on patients with sepsis. Dr. Zar opined that the incision and drainage procedure performed by Dr. Thakadiyil did not cause bacteria and toxins to enter plaintiff's system.

¶ 38   Dr. Zar further opined that the administration of intravenous fluids and antibiotics prior to the procedure would not have changed anything. This is because plaintiff's blood pressure was normal during the office visit and when he was seen in the emergency room. As such, his blood pressure demonstrated that he was not missing any fluids.

¶ 39   Dr. Zar also explained that he is a hospitalist, a physician who determines who to admit

_____

[2] Plaintiff's counsel did not object to this testimony.

to the hospital from the emergency room.  Dr. Zar opined that had he seen plaintiff in his capacity as a hospitalist at 11 a.m. on July 8, 2010, he would have examined him, realized the infection was localized, had the incision and drainage performed, prescribed an oral antibiotic and sent him home.  As an infectious disease doctor, he would have treated plaintiff in the same manner.

¶ 40    Dr. Zar also disagreed with Schlievert's opinion that the incision and drainage procedure caused the toxin to multiply.  Dr. Zar explained that millions of incision and drainage procedures are performed every year and therefore, if it were true that toxins so multiplied, physicians should be seeing hundreds of cases of toxic shock syndrome.  In reality, toxic shock syndrome is very rare and there are less than 1000 cases a year.  Dr. Zar further disagreed with Schilevert's opinion that plaintiff had a deadly amount of toxin in his blood stream before he arrived at the emergency room.  Dr. Zar explained that plaintiff's blood pressure was within the normal range when he arrived at the emergency room and therefore he was not in shock and his blood pressure remained in the normal range for several hours thereafter.

¶ 41    Lastly, Dr. Zar offered his own opinion as to how plaintiff's toxic shock syndrome developed.  According to Dr. Zar, plaintiff was administered vancomycin in the emergency room.  Vancomycin is an antibiotic that kills staph bacteria by effectively "poking holes" into the bacteria but doing so releases the toxin if the toxin is present.  Since the toxin was present in his blood, it was the antibiotic that caused the release of the toxin, not the incision and drainage procedure.  When it was suspected that plaintiff had toxic shock syndrome, his treating physicians changed the antibiotic from vancomycin to clindamycin.  Clindamycin kills the bacteria differently and does not cause the release of toxins as the bacteria dies.

¶ 42                                    *Closing Arguments and Verdict*

¶ 43    In closing, plaintiff's counsel argued that the standard of care required Dr. Thakadiyil to follow a strict definition of sepsis, two SIRS criteria and infection, which plaintiff clearly met when at the office visit. Counsel asserted that Dr. Thakadiyil failed to follow this standard of care where she did not even consider sepsis in her diagnosis. Counsel further maintained that Dr. Thakadiyil was additionally negligent when she performed the incision and drainage, spreading the bacteria and toxins throughout plaintiff's body. Thus, but for these negligent actions, plaintiff would not have suffered the bilateral amputation.

¶ 44    In response, defense counsel argued that the evidence demonstrated the diagnosis of sepsis was not a "cookbook definition" a physician was required to follow. Instead, clinical judgment and medical history was a significant part of diagnosing plaintiff. Here, Dr. Thakadiyil used her clinical judgment and based on plaintiff's medical history, his vital signs at the time of the office visit, and his overall appearance and demeanor, she believed the infection was localized to the carbuncle and treated it as such. Accordingly, Dr. Thakadiyil acted within the standard of care of a reasonably well-trained family medicine physician and did not cause plaintiff's ultimate injury.

¶ 45    After being instructed, the jury deliberated and ultimately found in favor of defendants. The jury further found that the sole proximate cause of plaintiff's injury was something other than the conduct of defendants.

¶ 46                                    *Motion for a New Trial*

¶ 47    Plaintiff thereafter moved for a new trial due to what he believed were the trial court's numerous errors. Specifically, plaintiff argued, in pertinent part, that the trial court allowed a biased juror to remain on the jury, the trial court erred in barring Dr. Hogarth from offering

standard of care opinions against Dr. Thakadiyil, Dr. Zar's undisclosed testimony about incising and draining an area near his daughter's bellybutton was a highly prejudicial Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) violation, and that defense counsel made improper, prejudicial statements during closing argument.

¶ 48     The trial court denied plaintiff's motion.  In so ruling, the trial court first addressed plaintiff's contention that it erred when it allowed juror Glascott to continue to serve as a juror when, in the middle of the trial, he self-reported that his private investment firm was responsible for investing the funds of the "Advocate endowment."  In finding no error occurred, the trial court reiterated that it found juror Glascott was not biased and that "if there were any type of business relationship with the defendant, it was extremely attenuated."  According to the trial court, "After extensively questioning the juror, the court believed that any relationship was remotely attenuated.  It was the court's impression that the relationship was so insignificant to this juror that he didn't even recall it at the time of *voir dire*[.]"  The court noted it closely scrutinized juror Glascott's demeanor and he was questioned by the court and counsel.  The court found he was "clearly credible when he responded that he would be truthful, fair and unbiased."  The court further explained its determination:

> "It's the court's impression that [juror Glascott] was embarrassed that he forgot to
> volunteer the information during *voir dire* because the information was so insignificant to
> Mr. Glasscott [*sic*] that he did not think to do so as he did not recall it then.  It was
> apparent that he did not know which Advocate entity was involved with the endowment
> or exactly which fiduciary responsibilities he might have had.  Whatever they were, they
> were extremely attenuated to the point they were insignificant to the juror.  Moreover, his
> compensation was not impacted in any way by the case or defendants."

¶ 49    The trial court next addressed plaintiff's contention that it erred in barring Dr. Hogarth from offering standard of care opinions against Dr. Thakadiyil.  The court reaffirmed its prior ruling explaining, "Dr. Hogarth, a pulmonary and critical care physician, was appropriately barred from offering standard of care opinions against Defendant Dr. Thakadiyil, a generalist trained in family medicine who had no training or certifications as a pulmonary or critical care physician."  The court indicated it had reviewed Dr. Hogarth's deposition testimony and disclosures and found "it was apparent Dr. Hogarth had never disclosed that he was offering his opinion from a family practice physician's perspective and level of proficiency."  Accordingly, in the absence of any Rule 213 disclosure that the standard of care was the same for a generalist trained in family medicine and a pulmonary and critical care physician, the trial court granted the motion *in limine*.  The trial court further emphasized that "Dr. Hogarth never specifically disclosed or previously testified that the standard of care was the same for both specialties for the procedure at issue."  In addition, the court found that, "Dr. Hogarth represented that he does not practice as a primary care physician and did not consider himself to be one."

¶ 50    The trial court further observed that plaintiff "competently presented similar testimony from Dr. Ewigman – an expert who had the same board certification and area of expertise as Dr. Thakadiyil."  Dr. Ewigman testified extensively as to the standard of care including testimony regarding the proper timing and management of an incision and drainage in a patient who presented with plaintiff's signs and symptoms.  The court then found that, given the wide degree of latitude it gave to Dr. Ewigman and Schlievert during their testimonies, any additional testimony from Dr. Hogarth would have been merely cumulative.

¶ 51    Regarding Dr. Zar's undisclosed testimony about an incision and drainage he performed on his daughter, the trial court first observed that there was no objection made to the testimony

the first time it was volunteered. Because plaintiff had no objection at the time the testimony was initially rendered, the trial court had no opportunity to rule on it the first time it was made and found the objection to be forfeited. The trial court further noted that this anecdote was "not a new opinion pertaining to the care and treatment of the plaintiff." The trial court also acknowledged that when Dr. Zar again raised this anecdote on redirect, plaintiff objected to the testimony and the court sustained the objection. The trial court observed that it had provided "clear instructions to the jury on objections [that] were made even before opening statements began" and, "[i]n the court's opinion, this jury understood its obligation to disregard the questions and responses to any of the objections that were sustained, including the belly button ring anecdote."

¶ 52    Lastly, the trial court addressed the propriety of defense counsel's comments during closing argument. Plaintiff complained that defense counsel violated the "golden rule" when she "essentially told the jury to place themselves in the position of Dr. Thakadiyil" and misstated the evidence when she indicated that it was "unrefuted" that the SIRS criteria were abandoned in the early 2000s. Ultimately, the trial court found that no prejudice resulted from defense counsel's "golden rule" statement where the objection was sustained, thus curing any prejudice. The court further found that the prejudice was similarly cured from its numerous admonishments throughout the trial, and during counsel's argument, that the arguments of the attorneys are not evidence. According to the trial court, the jury was attentive and well instructed on the purpose of closing arguments. This appeal followed.

¶ 53                                    ANALYSIS

¶ 54    Plaintiff now appeals arguing the trial court committed numerous errors including: (1) failing to dismiss a juror for cause; (2) granting a motion *in limine* preventing one of his experts

from testifying as to Dr. Thakadiyil's standard of care; and (3) allowing defendant's expert to testify about his personal practices despite a motion *in limine* prohibiting such testimony. In his fourth argument, asserts that he was prejudiced by certain statements made by defense counsel during closing argument. We address each issue in turn.

¶ 55                                         Juror Bias

¶ 56     Plaintiff's first contention on appeal is that juror Glascott's relationship with defendant Advocate Medical was so prejudicial to him as to warrant a new trial. He claims that the trial court's finding that no fiduciary duty existed between juror Glascott and defendant Advocate Medical was incorrect as a matter of law. He further asserts that the trial court's ultimate determination that juror Glascott was not biased was against the manifest weight of the evidence where juror Glascott represented he had a direct relationship with defendant Advocate Medical.

¶ 57     Plaintiff directs us to the case of *People v. Cole*, 54 Ill. 2d 401 (1973), as being instructive on this issue. In *Cole*, our supreme court stated that "there are certain relationships which may exist between a juror and a party to the litigation which are so direct that a juror possessing the same will be presumed to be biased and therefore disqualified." *Id.* at 413. However, "[b]eyond these situations which raise a presumption of partiality," impartiality is not a technical concept but, rather, it is a state of mind. *Id.* More specifically, a person is not competent to sit as a juror if his or her state of mind is such that with him or her as a member of the jury, a party will not receive a fair and impartial trial. *Id.* In addition, the burden of demonstrating that a juror is partial rests on the party challenging the juror and more than a mere suspicion of bias must be established. *Davis v. International Harvester, Co.*, 167 Ill. App. 3d 814, 821 (1988).

¶ 58     Looking first at whether there was a presumption of bias based on plaintiff's assertion

that juror Glascott had a fiduciary relationship with defendant Advocate Medical, we conclude that plaintiff has failed to meet his burden. The record reveals that, after plaintiff had rested and while defendants were presenting their case-in-chief, juror Glascott self-reported to the court as follows: "Although I don't believe it would bias me, I thought I should disclose that my firm has a business relationship with Advocate. I apologize. I did not realize or think of this until last night." Plaintiff moved to strike juror Glascott for cause. During *voir dire* Juror Glascott had identified himself as the chief information officer of a private investment firm. The trial court then conducted a hearing outside the presence of the jury and questioned juror Glascott regarding his relationship with defendant Advocate Medical.

¶ 59    According to juror Glascott, in his role as chief information officer, he oversees all the new investments that his company makes, which would include the money the Advocate endowment invests. In exchange, his company receives an asset management fee on the assets under management. While he receives a salary, his bonus is tied to the growth of the investments and whether he invests his own money as well. When directly asked, "if the defendant wins or loses in the case, is your financial compensation affected in any way by the verdict," juror Glascott responded, "No."

¶ 60    Juror Glascott further informed the court that the Advocate endowment is a limited partner. Juror Glascott explained that "in a private equity fund, you have a general partner and a series of limited partners, and I said the 50 investors, or whatever the number, they're one of the investors" and his company is the general partner. According to juror Glascott, he has a fiduciary duty as a general partner and to the Advocate endowment, but he does not have a fiduciary duty to either of the defendants.

¶ 61    When asked why he waited to so inform the court, juror Glascott replied that he "just

didn't realize" his business relationship with an Advocate entity during jury selection. Juror Glascott noted that there was no specific question during *voir dire* regarding whether he had a business relationship with Advocate Medical. It was for this reason that he did not make the connection. Regarding the nature of his firm's relationship with defendant, juror Glascott explained:

> "So their hospital endowment invests in one of our -- we're a private equity company that raises funds to invest in real estate. They're one of our limited partners that invests through one of our funds. So they're 1 of 50 investors in one of our funds. I don't know if that's the right number, but they're one of our investors." Juror Glascott further explained that "the endowment raises money for the growth and expansion of the hospital system overall. So they have a pool of money that they invest to grow the hospital system."

The trial court then asked juror Glascott if his relationship with the hospital endowment "in any way color[s] the view that you have of the evidence," to which juror Glascott replied, "No." Juror Glascott further stated he could stay neutral and unbiased to both parties.

¶ 62    Juror Glascott clarified that he does not have a business relationship with Advocate Medical, but with the "Advocate Health Care system endowment." It was juror Glascott's understanding that the endowment is separate and apart from Advocate Medical and has no relationship with Dr. Thakadiyil. Juror Glascott further addressed the court's inquiries into whether the endowment pays either of the defendants. Juror Glascott acknowledged that he was not sure where the funds from the endowment are applied, but that he believes the endowment's purpose is to grow hospitals by "build[ing] buildings, that type of thing." Defendants' counsel then represented that the salaries and compensation for Advocate Medical comes specifically

from Advocate Medical operations, not from the endowment. She further indicated that this information could be found in the physicians' employment contracts.

¶ 63    Based on this record, we conclude that plaintiff has failed to demonstrate juror Glascott's relationship with defendant Advocate Medical rises to the level of presumed bias. No evidence was presented to the trial court regarding the relationship between defendant Advocate Medical and the Advocate endowment. Juror Glascott himself did not know the nature and extent of the relationship. It was his understanding, however, that he would not be affected financially by the result of this lawsuit. In addition, defense counsel represented that the salaries and compensation for Advocate Medical came from Advocate Medical operations not from the endowment. She further indicated that this information could be found in the physicians' employment contracts. In sum, the evidence was insufficient to demonstrate any express fiduciary relationship between juror Glascott and defendant Advocate Medical.

¶ 64    Plaintiff argues that *City of Naperville v. Wherle*, 340 Ill. 579 (1930), *Cole*, and *Marcin v. Kipfer*, 117 Ill. App. 3d 1065 (1983), compel a different result. These cases, however, are factually inapposite as they demonstrate there was a direct relationship between the juror and one of the parties to the litigation.

¶ 65    We next turn to consider whether the trial court abused its discretion when it denied plaintiff's motion to excuse juror Glascott for cause. The trial court denied the motion asserting the following:

> "This ruling is based just really completely on the demeanor of the juror and what he
>
> says. When he says that he does not believe that he would be biassed [*sic*], he was pretty
>
> adamant that he could be fair all the way through. It just seemed to me that in an
>
> abundance of caution, he decided to disclose this information ***.

I find that he has not – there is no direct[] fiduciary duty between this juror and either of the defendants in this case. He's not someone who is responsible for Advocate or managing the money. Advocate is not responsible for him in any way. So he didn't even know about this at all, and it really is not something that he believes would even factor into his decision.

So in really scrutinizing this juror, this is the reason why I had him come back here so that I could really take a good look at him. If I thought that he couldn't be fair or that there was a risk with his demeanor that he couldn't be fair, I would have excused him right away, but I find that he could be fair and that he would be fair and will be fair."

¶ 66    Based on this record, we cannot say that the trial court abused its discretion when it denied plaintiff's motion to remove juror Glascott for cause. Pursuant to *Cole*, the trial court was to first consider whether a direct relationship existed between the juror and a party to the litigation creating a presumption of bias. See *Cole*, 54 Ill. 2d at 413. Second, if no presumed bias existed, then the trial court was to examine the juror's state of mind. See *id.* As previously discussed, the trial court correctly found that plaintiff presented no evidence of a direct relationship between defendant Advocate Medical and the Advocate endowment. The trial court then went on to examine juror Glascott's state of mind and found him to be unbiased. The trial court was clear in its order that it based this determination on juror Glascott's demeanor, and it is well-established that the trial court is in a superior position from which to judge the juror's candor. See *Jones v. Rockford Memorial Hospital*, 316 Ill. App. 3d 124, 129 (2000) (The trial court is in a superior position to observe the demeanor of a juror and judge his or her credibility). A trial court's decision whether to discharge a juror during trial is within the sound discretion of the trial court and based on the record before us we see no reason to disturb the trial court's

judgment in this instance.  See *Addis v. Exelon Generation Co., LLC*, 378 Ill. App. 3d 781, 791 (2007).  Accordingly, we conclude that no error occurred regarding the issue of juror bias.

¶ 67                                     Motion *in Limine*

¶ 68     Plaintiff next contends that the trial court committed reversible error in barring his expert, Dr. Hogarth, from testifying to the standard of care for diagnosing sepsis because he was not a member of the same medical specialty as Dr. Thakadiyil.  In response, defendants assert that the trial court's decision was proper where Dr. Hogarth testified at his discovery deposition that he was offering standard of care opinions from the perspective of a critical care specialist and pulmonary physician, not as an internal medicine or family practice physician.  In the alternative, defendants argue that plaintiff's alleged error was harmless where the trial court, in its discretion, barred Dr. Hogarth's standard of care testimony as cumulative.

¶ 69     An expert witness is a person who, because of education, training, or experience, possesses specialized knowledge beyond the ordinary understanding of the jury.  *Hubbard v. Sherman Hospital,* 292 Ill. App. 3d 148, 153 (1997).  In medical malpractice cases, "[i]t must be established that the expert is a licensed member of the school of medicine about which he proposes to express an opinion [citation] and the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." *Purtill v. Hess,* 111 Ill. 2d 229, 243 (1986); see also *Gill v. Foster,* 157 Ill. 2d 304, 316 (1993).  Whether the plaintiff's medical "expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant, but, rather, whether the allegations of negligence concern matters within his knowledge and observation." *Jones v. O'Young,* 154 Ill. 2d 39, 43 (1992).

¶ 70     While our courts have stated that the foundational requirements of an expert's

qualifications are reviewed as a matter of law *de novo* (see *Roach v. Union Pacific R.R.*, 2014 IL App (1st) 132015, ¶ 51; *McWilliams v. Dettore*, 387 Ill. App. 3d 833, 844 (2009)), it has also been said that a trial court's determination regarding whether someone is qualified to testify as a medical expert is ultimately reviewed for an abuse of discretion (see *Gill,* 157 Ill. 2d at 317; *Ayala v. Murad*, 367 Ill. App. 3d 591, 597 (2006)).  An abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view.  *Kunz v. Little Co. of Mary Hospital & Health Care Centers, 373 Ill. App. 3d 615, 624 (2007).*  In determining whether there has been an abuse of discretion, the appellate court does not substitute its own judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely.  *Roach*, 2014 IL App (1st) 132015, ¶¶ 19-20.  This same deferential standard also applies to a trial court's decision on a motion *in limine.  Maggi v. RAS Development, Inc.,* 2011 IL App (1st) 091955, ¶ 61.

¶ 71     The outcome of this case, however, is the same regardless of the standard of review employed.  Here, the trial court barred Dr. Hogarth from testifying regarding Dr. Thakadiyil's standard of care when ruling on a motion *in limine.*  Such a motion seeks a preliminary evidentiary ruling for purposes of the trial.  See *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 681 (2003) ("Motions in *limine* are not designed to obtain rulings on dispositive matters but, rather, are designed to obtain rulings on *evidentiary* matters outside the presence of the jury." (Emphasis in original.)).  Erroneous evidentiary rulings are only a basis for reversal if the error was "substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.)  *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 192.  We will not reverse if it is apparent that "no harm has been done."  *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991).  Importantly, "[w]hen erroneously admitted evidence is cumulative and

does not otherwise prejudice the objecting party, error in its admission is harmless." *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1013 (2005). "The burden rests with the party seeking reversal to establish prejudice." *Watkins v. American Service Insurance Co.*, 260 Ill. App. 3d 1054, 1065 (1994).

¶ 72     In this case, any error in barring Dr. Hogarth's testimony on Dr. Thakadiyil's standard of care was harmless. See *Hazelwood v. Illinois Central Gulf R.R.*, 114 Ill. App. 3d 703, 708 (1983) (finding that evidence that is merely cumulative was harmless error); *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). Dr. Hogarth presented expert testimony regarding causation. Dr. Hogarth specifically opined that the incision and drainage performed by Dr. Thakadiyil worsened plaintiff's sepsis and caused plaintiff to go into septic shock that resulted in the loss of his legs. Dr. Hogarth further opined that when Dr. Thakadiyil treated plaintiff he had sepsis and that if plaintiff had received intravenous fluids before the incision and drainage procedure was performed plaintiff's injury would never have occurred. While Dr. Hogarth was barred from opining as to Dr. Thakadiyil's standard of care for treating sepsis, Dr. Ewigman, a family medicine physician, testified extensively as to Dr. Thakadiyil's standard of care, including testimony regarding the proper timing and management of an incision and drainage in a patient who presented with plaintiff's signs and symptoms. The jury was thus presented with competent testimony supporting plaintiff's theory of negligence and that Dr. Thakadiyil's failure to diagnose sepsis, failure to properly treat plaintiff, and her failure to send plaintiff directly to the emergency room, caused his injury. See *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 84. Considering the testimony presented at trial, Dr. Hogarth's standard of care testimony was merely cumulative and, as such, it did not amount to reversible error. See *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39 (a physician's testimony, whether

admitted erroneously or not, was cumulative of the evidence at trial and could not have affected its outcome); see also *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 77 (the trial court may exercise its discretion to limit the number of expert witnesses a party may present).

¶ 73                                    Dr. Zar's Commentary

¶ 74    Plaintiff next asserts that he was denied a fair trial where Dr. Zar supported his causation opinion by testifying to a specific incision and drainage he had performed on his own daughter. Plaintiff maintains that this testimony was unfairly prejudicial where it was not previously disclosed pursuant to Rule 213 and testimony regarding an expert's personal practices had been barred by a motion *in limine*. In response, defendants maintain that Dr. Zar did not testify that this incident formed the basis of his opinion that the incision and drainage at issue did not cause toxic shock. Defendants further observe that plaintiff did not object to Dr. Zar's earlier reference in his trial testimony to performing an incision and drainage on his daughter.

¶ 75    We review the trial court's admission of evidence for an abuse of discretion. *Jefferson*, 2018 IL App (1st) 162219, ¶ 39. An abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view. *Kunz, 373 Ill. App. 3d at 624.*

¶ 76    The record reflects that during cross-examination and numerous recross-examinations, plaintiff's counsel did not question Dr. Zar about the incision and drainage he performed on his daughter. On one redirect, which is pertinent to this appeal, in response to a question regarding whether he ever considers that toxic shock syndrome could develop from performing an incision and drainage procedure, Dr. Zar discussed the anecdote. Dr. Zar stated that the possibility of toxic shock syndrome was never on his mind and explained that he even performed an incision and drainage on his daughter's belly button after it had become infected without such a thought.

Dr. Zar went on to briefly explain that the incision and drainage he performed on his daughter, who had a fast pulse and a fever, was routine and he did not send her to the emergency room or administer intravenous fluids or antibiotics prior to the procedure. Plaintiff's counsel objected to this testimony without stating a basis for his objection. The trial court sustained plaintiff's counsel's objection and Dr. Zar's testimony concluded immediately thereafter. Plaintiff's counsel did not move to strike Dr. Zar's response.

¶ 77     We agree with the trial court's determination that plaintiff forfeited this issue by not objecting to the content of this testimony the first time it was raised on direct examination of Dr. Zar. A denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial. *Brown v. Baker*, 284 Ill. App. 3d 401, 406 (1996). When a motion *in limine* is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review. *Id.* Absent the requisite objection, the right to raise the issue on appeal is forfeited. *Roach*, 2014 IL App (1st) 132015, ¶ 28. The same principle rings true for a party's failure to raise an objection to a Rule 213 violation. See *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147, 156 (2010). In this instance, because plaintiff failed to object to Dr. Zar's initial testimony regarding the belly button anecdote, we find this issue to be forfeited.

¶ 78     We further observe that Dr. Zar initially testified about the incision and drainage he performed on his daughter on direct examination, accordingly plaintiff's argument that he did not have an opportunity to cross-examine Dr. Zar is incorrect. In addition, we note that plaintiff's objection to Dr. Zar's testimony on redirect was sustained and that, when sustained, an objection cures any prejudicial impact from the testimony. *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 383 (2003). Accordingly, even if we were to consider this issue, no prejudice resulted from Dr. Zar's testimony.

¶ 79                                    Closing Argument

¶ 80     Lastly, plaintiff maintains that there were two significant errors in defense counsel's closing argument which deprived him of a fair trial.  First, plaintiff asserts that defense counsel violated the "golden rule" by asking the jurors to stand in the position of a party and to determine the standard of care from an improper perspective.  Second, plaintiff contends that defense counsel misstated already prejudicial testimony regarding a post-occurrence change to the standards used to diagnose sepsis.  Plaintiff argues as these two errors went to the critical issue of standard of care, the remarks are sufficiently prejudicial to have affected the outcome of the case and a new trial is required.

¶ 81     In response, defendants argue that defense counsel did not ask the jurors to stand in the shoes of Dr. Thakadiyil nor did defense counsel appeal to the sympathy of the jury.  Defendants further assert that defense counsel did not misstate the evidence and that plaintiff is taking counsel's remarks out of context.  When viewed in context, defendants maintain it is apparent that defense counsel's comments were a fair comment on the evidence presented.  Lastly, defendants maintain that any possible error was cured when the trial court, on numerous occasions, admonished the jury that arguments made by counsel that are not based on the evidence should be disregarded.

¶ 82     The standard of review in the examination of specific remarks made during closing argument is whether the comments were of such character as to have prevented the opposing party from receiving a fair trial.  *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 29.  Ultimately, a trial court is given discretion in the scope of closing argument and its judgment as to the propriety of the comments therein will not be reversed unless the remarks are of a character that prevented a fair trial.  *Weisman v. Schiller, Ducanto and Fleck, Ltd.,* 368 Ill.

App. 3d 41, 62 (2006).

¶ 83    We begin by addressing the comment plaintiff maintains instructed the jurors to disregard the evidence they heard from the medical experts and instead call upon their own personal experience to decide whether plaintiff had sepsis.  During closing argument, attorneys have wide latitude to comment and argue based on the evidence presented at trial as well as draw any reasonable inferences from that evidence.  *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008).  However, when arguing to the jury, attorneys should not unfairly appeal to its emotions.  *Chakos v. Illinois State Toll Highway Authority*, 169 Ill. App. 3d 1018, 1029 (1988).  The jury must decide the case based on the evidence and issues presented at trial "unencumbered by appeals to [its] passion, prejudice or sympathy."  *Lorenz v. Siano*, 248 Ill. App. 3d 946, 953 (1993).  One line of argument that this court has repeatedly found to improperly elicit passion, prejudice, or sympathy from the jury is asking it to place itself in the position of either the plaintiff or the defendant.  See *Koonce ex rel. Koonce v. Pacilio*, 307 Ill. App. 3d 449, 457 (1999); *Chakos*, 169 Ill. App. 3d at 1029.  The alleged improper comments must be viewed not in isolation, but within the context of the entire closing argument.  *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 102-03 (1991).  As a result, some golden rule arguments, while technically improper, may not elicit passion, prejudice, or sympathy from the jury.  See *Offutt v. Pennoyer Merchants Transfer Co.*, 36 Ill. App. 3d 194, 204 (1976).

¶ 84    Plaintiff maintains that the comment made in this case is identical to one made in *Sikora v. Parikh*, 2018 IL App (1st) 172473, ¶ 60.  We disagree.  The comments in *Sikora* were markedly different from the comments in the case at bar.  In *Sikora*, the defense counsel told the jury, "You need to evaluate this case for Dr. Parikh from a prospective analysis.  Stand in her shoes on that morning ***."  *Id.* ¶ 63.  Here, defense counsel's argument did not encourage the

jurors to literally "stand in the shoes" of Dr. Thakadiyil and is thus distinguishable.

¶ 85    The comment, in context, was as follows:

> "People present to family medicine physicians, internal medicine physicians, outpatient clinics every single day with what? An infection, respiration elevated, fevers. You get a flu. Strep throat. Infection of any sort; urinary tract, lung. You can have any of those, any of them, and in combination. That's where clinical judgment is involved.

> This is the most common presentation in any family medicine or outpatient clinic, showing up with an infection and fever, pulse rate. This is common.

> And you are allowed to bring your common sense into this courtroom. That is permitted.

> Two SIRS, infection, is not the diagnosis of sepsis. Otherwise, respectfully, *every single one of us at some point in time, and more than one, has had sepsis. Because every single one of us has had an elevated pulse rate, a little respirations, a temperature of 101.*

> [Plaintiff's counsel]: Objection, Your Honor. Facts not in evidence. No basis.

> [Defense counsel]: Your Honor, this is argument.

> THE COURT: Sustained.

> Counsel should not ask jurors to put themselves in the position of the witnesses or the parties. So sustained." (Emphasis added.)

¶ 86    We decline to accept plaintiff's argument that these remarks instructed the jurors to disregard the evidence they heard from the medical experts and instead call upon their own personal experience to decide whether plaintiff had sepsis. The comment that "every single one of us at some point in time *** has had sepsis" and the colloquy that followed directed the

jurors' attention to the differences in the experts' iterations of the standard of care. While plaintiff's expert set forth that the standard of care was defined as two SIRS criteria plus infection, the defense experts, on the other hand, testified that the standard of care was not a "cookbook definition" but also involved clinical judgment. Defense counsel's argument is a direct reference to the evidence and the "battle of the experts" that it presented. As such, the commentary did not violate the "golden rule." Furthermore, defense counsel's remark was a commentary on the evidence that someone with an infection can have two of the SIRS criteria and not have sepsis.

¶ 87    Moreover, any potential prejudice from this remark was cured when counsel's objection was sustained by the trial court. See *People v. Saxon*, 226 Ill. App. 3d 610, 622 (1992); *Copeland v. Johnson*, 63 Ill. App. 2d 361, 367 (1965) (even if the comment was error, the error could have been cured by the court upon proper objection). More importantly, the trial court directly instructed the jury on this precise issue when it stated, "Counsel should not ask jurors to put themselves in the position of the witnesses or the parties." See *Sikora*, 2018 IL App (1st) 172473, ¶ 64 ("what prejudice did result from the argument was mitigated by the trial court's sustained objection paired with its instruction to disregard the comment"). In addition, the trial court admonished the jury on numerous occasions during the trial and closing arguments that the arguments of the lawyers are not evidence and that any argument not based on the evidence should be disregarded. See *Lecroy v. Miller*, 272 Ill. App. 3d 925, 933 (1995) (stating "when a trial court sustains an objection to improper remarks of counsel and admonishes the jury that counsel's remarks are not evidence, any error is cured"). It is well established that improper remarks generally do not constitute reversible error unless they result in substantial prejudice. See *Saxon*, 226 Ill. App. 3d at 622. Substantial prejudice means that absent the remarks, the

outcome of the case would have been different. *People v. Simms*, 192 Ill. 2d 348, 397 (2000). Here, the exclusion of defense counsel's remarks would not have changed the outcome of the trial. As noted by defendants, the jury specially found that the sole proximate cause of plaintiff's injury was something other than the conduct of defendants. Accordingly, based on the record presented, we decline to find that plaintiff was prejudiced by these remarks.

¶ 88      Plaintiff next argues that defense counsel misrepresented Dr. Zar's testimony about the change in the standards to diagnose sepsis and further violated a motion *in limine* prohibiting this testimony to establish the standard of care. The comment being challenged was as follows:

> "Diagnose sepsis, send them to an emergency room. Incision and drainage, send them to an emergency room. Perform an incision and drainage, send them to an emergency room. That's what this whole case from plaintiff has boiled down to.
>
> So it does not stop, as [plaintiff's counsel] said, at did you diagnose sepsis.
>
> But I want to take each of those allegations one at a time and tell you what I think the evidence showed on those very key issues on the standard of care.
>
> Well, sepsis. We have heard an awful lot about SIRS, two SIRS, known or suspected site of infection. That has been something we have heard a lot about during the course of this trial.
>
> And it was yesterday when we finally learned that *as of early 2000s, which stands unrefuted, this has not been used*.
>
> [Plaintiff's counsel]: Objection, Your Honor.
>
> [Defense counsel]: And it is not –
>
> [Plaintiff's counsel]: Motion in limine.
>
> [Indiscernible crosstalk.]

[Plaintiff's counsel]: Mischaracterizes the evidence.

THE COURT: Okay. Again, Counsel may argue, but arguments of the lawyers are not – that are not based on the evidence should be disregarded by you.

But as this is the inference that Counsel sees in the evidence, overruled."

(Emphasis added.)

According to plaintiff, Dr. Zar's testimony was that "we started to realize that the SIRS criteria in the early 2000s was probably too loose" not, as defense counsel argued, that in the early 2000s it was not used at all. Plaintiff asserts this argument was highly prejudicial where it attempted to backdate the change in the standards and was confusing in regards to what the standard of care was at the time of Dr. Thakadiyil's treatment. Plaintiff further contends that this error was compounded when defense counsel argued that the change of standards in the early 2000s was unrefuted. Plaintiff points out that Dr. Ewigman testified the SIRS definition was the standard of care to diagnose sepsis in 2010 and Dr. Hogarth used the same definition to define the standard of care as well. Plaintiff notes that even Dr. Thakadiyil acknowledged that the SIRS criteria were "general variables" for sepsis at the time she treated plaintiff and even Dr. Zar admitted on cross-examination that the SIRS criteria were used in 2010. In response, defendants note that Dr. Zar's testimony was actually that "in the early 2000s" it was learned that the SIRS criteria were of no benefit and societies began abandoning its use.

¶ 89      We agree with defendants that counsel's commentary was not a pure misstatement of the evidence. A review of the record reflects that Dr. Zar did testify that in the early 2000s a study found that the SIRS criteria were of no benefit. But while there was no misstatement in this regard, defense counsel did misstate that this evidence was "unrefuted." We thus agree with plaintiff that the jury was presented with evidence regarding the use of the SIRS criteria in 2010.

Consequently, because the jury was presented with the overwhelming evidence that the SIRS criteria was in use in 2010, along with the trial court's numerous instructions to disregard any comments by the attorneys that do not accurately reflect the evidence, we conclude that defense counsel's remark did not prejudice plaintiff. See *Cahill v. Boury*, 144 Ill. App. 3d 413, 419 (1986) (finding that, despite a misstatement of the evidence, any error would have been cured by the trial court's instruction that the jurors should rely on their own memory of the evidence).

¶ 90    Furthermore, when taken in context, defense counsel's misstatement was a minor error. A misstatement by counsel will not deny the losing party a fair trial where the misstatement comprises only a small segment of the closing argument and the jury is instructed that closing arguments are not evidence. See, *e.g., Lagoni v. Holiday Inn Midway*, 262 Ill. App. 3d 1020, 1035 (1994); see also *Wilson v. Humana Hospital*, 399 Ill. App. 3d 751, 759 (2010) (and cases cited therein discussing harmless error). In this instance, after the jury was admonished that the attorney's argument was not evidence, defense counsel moved on from discussing the viability of the SIRS criteria in 2010 and instead focused on her theory that Dr. Thakadiyil was entitled to use her clinical judgment to diagnose plaintiff. Additionally, this misstatement was comprised of only a few words in a 46-page argument. See *Lagoni*, 262 Ill. App. 3d at 1035. These factors militate against finding that plaintiff was denied a fair trial. See *id.* Accordingly, when the trial is viewed in its entirety, plaintiff fails to establish defense counsel's misstatement resulted in substantial prejudice to him or prevented a fair trial. See *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84.

¶ 91    In sum, finding no reversible error was committed by the trial court, we affirm its judgment.

¶ 92                                    CONCLUSION

¶ 93    For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

¶ 94    Affirmed.

---

**No. 1-19-0778**

---

| | |
|---|---|
| **Cite as:** | *Ittersagen v. Advocate Health and Hospitals Corporation*, 2020 IL App (1st) 190778 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-3532; the Hon. Rena Van Tine, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jason R. Williams, and Carla A. Colaianni, of JR Williams Law, of Chicago, Illinois, for appellant. |

---

| | |
|---|---|
| **Attorney for Appellee:** | Robert L. Larsen, of Cunningham, Meyer & Vedrine, P.C., of Warrenville, Illinois, for appellee. |

---