REBECCA JACKSON, Special Adm'r of the Estate of Ken Dale Jackson, Deceased, Plaintiff-Appellant, v. ARMANDO PELLERANO et al., Defendants-Appellees.

First District (2nd Division) No. 1—89—0652

Opinion filed March 5, 1991.

Steven J. Rosenberg, P.C., of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Douglas L. Prochnow and Mark P. Miller, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Rebecca Jackson brought suit against defendants Balasubramaniam Iyer, M.D. (Iyer), and Armando Pellerano, M.D. (Pellerano), alleging medical malpractice in their failure to treat her husband, decedent Ken Dale Jackson (Jackson). After a jury verdict in favor of defendants, plaintiff filed post-trial motions for a new trial or for judgment notwithstanding the verdict and for sanctions against Iyer and his counsel. The motions were denied. Plaintiff appeals, raising as issues (1) whether the circuit court erred in admitting evidence concerning the intoxication of plaintiff's decedent; and (2) whether the circuit court erred in denying plaintiff's motion for section 2—611 sanctions (Ill. Rev. Stat. 1987, ch. 110, par. 2—611) against Iyer and his counsel.

On July 21, 1983, just before 6 p.m., Ken Jackson was injured in a single-car accident on the Stevenson Expressway when the van he was driving hit an abutment. At approximately 6 p.m., paramedics Roberto Lopez and Rudy Agguire arrived at the accident scene and transported Jackson to St. Anthony Hospital.

Although he was diabetic, restless, unruly, and combative, Jackson was in stable condition when he arrived at the hospital. After making his diagnosis that Jackson was a multiple-trauma patient and ordering X rays, Surander Singhal, M.D., the emergency room physician, ended his shift at 7 p.m., and Santosh Gill, M.D., a cardiology resident moonlighting at St. Anthony Hospital, took over the care of Jackson.

When Dr. Gill assumed Jackson's care from Dr. Singhal, she determined that Jackson's vital signs were stable and that he was experiencing mild respiratory distress. She also determined that he had a fracture of the left eighth rib, a fracture of the right femur, and a possible fat embolism. In addition, Jackson's lab results, taken at 6:45 p.m., showed that no alcohol was detected in his blood.

Since the common practice at St. Anthony Hospital regarding multiple-trauma patients in the emergency room was to contact the general surgeon on call, Dr. Gill telephoned defendant Pellerano and advised him of Jackson's status. Although Dr. Gill could not remember what she told Pellerano, her usual practice was to evaluate the patient, obtain a short history, and describe the physical findings and lab results to him. Pellerano was advised that Jackson was involved in an automobile accident, and that he had a broken leg, chest trauma, and bruises and cuts on his face and scalp. Pellerano also learned from Dr. Gill that she had reviewed the X rays.

Based on this information, Pellerano told Dr. Gill to contact Dr. Vachout, an orthopedist, concerning the bone injuries, and defendant Iyer, a thoracic surgeon, concerning the chest trauma. The medical chart on Jackson reflected that Iyer was called at 8:50 p.m. and Dr. Vachout was called at 9 p.m. Although she could not recall what she told Iyer, as a rule, Dr. Gill would have told him the same things she told the general surgeon, information concerning the patient's condition and the lab results. Iyer had no recollection, however, of receiving a call from anyone at St. Anthony Hospital at 8:50 p.m.

At about 9:15 p.m., Jackson's condition worsened. Dr. Gill summoned Dr. Travino, the house physician in charge of the entire hospital except for the emergency room. The diagnosis of hemothorax, or blood in the chest cavity, was made after Dr. Gill consulted with Dr. Travino. By 9:30, Dr. Travino had taken over Jackson's care and treatment. Dr. Travino inserted a chest tube in Jackson's left chest and inserted a tube in his trachea to assist breathing.

According to the nurses' notes, Iyer was called again at 9:45 p.m.; however, it was not known who spoke with him. Iyer had no recollection of receiving this call.

At approximately 10:35 p.m., Pellerano spoke with Dr. Gill on the telephone for the second time that evening, and was informed that Jackson was in shock and his condition was deteriorating. He advised Dr. Gill that he was coming to the hospital right away. Upon arrival at the emergency room, Pellerano was advised that Jackson had been taken to the intensive care unit.

When Pellerano arrived at the intensive care unit at approximately 11:15 p.m., a code blue was underway. Dr. Travino, the code blue leader, was attempting to resuscitate Jackson; nurses and respiratory therapists were assisting; and a crash cart was present. Shortly before Pellerano's arrival, Jackson had suffered cardiac arrest. Pellerano remained at the intensive care unit doorway, observed the activities, and determined that the medical team was following the correct procedures for a code blue. He stayed in the intensive care unit in case he was needed as a backup for Dr. Travino. The code blue lasted approximately 1 hour and 10 minutes; Pellerano pronounced Jackson dead at 12:15 a.m. on July 22, 1983.

On July 11, 1984, plaintiff filed a malpractice complaint against Pellerano and others to recover damages for the alleged wrongful death of Jackson. Iyer was added as a defendant in plaintiff's first amended complaint. Based upon his testimony that he was never asked to, nor did he, treat plaintiff's decedent, Iyer moved for dismissal. Judge Nicholson granted Iyer's motion on October 30, 1985.

Plaintiff appealed the dismissal, and on March 8, 1988, the appellate court reversed Judge Nicholson's order and remanded the case to the circuit court. (*Jackson v. Iyer* (1st Dist. 1988), No. 86—3134 (unpublished order under Supreme Court Rule 23).) On May 5, 1988, a motion was filed to have the case against Pellerano set for trial on a date certain. On May 19, 1988, Iyer's counsel was mailed a copy of the appellate court's letter transmitting the mandate to the circuit court.

On June 9, 1988, Judge Foreman set a trial date of September 22, 1988. On June 20, 1988, counsel for Pellerano mailed copies of the June 9, 1988, order to counsel for plaintiff and counsel for Iyer. In addition, on June 21, 1988, plaintiff's counsel wrote a letter to Iyer's counsel which advised him that Iyer was back in the case. Between June 9, 1988, and September 22, 1988, counsel for plaintiff and defendants corresponded on numerous occasions in connection with discovery and the upcoming trial.

On September 22, 1988, counsel for Pellerano and counsel for plaintiff appeared, but counsel for Iyer did not. After receiving a call from the trial judge, Iyer's counsel appeared in a special and limited

capacity to contest the court's assertion of personal jurisdiction. Iyer argued that, following the reversal of Judge Nicholson's order on March 8, 1988, plaintiff had failed to properly reinstate her case under Supreme Court Rule 369(c) against Iyer. 107 Ill. 2d R. 369(c).

After a full hearing on the reinstatement issue, the trial judge ruled that the mandate which issued on May 19, 1988, reinvested the circuit court with jurisdiction, that Iyer was properly a party to the lawsuit, and that the trial should proceed.

On the morning of September 26, 1988, Iyer moved for *mandamus* relief and an emergency stay of the trial in the Illinois Supreme Court and served those motions upon all parties and the trial judge. The trial judge, however, ordered that the trial begin immediately. Iyer then filed a motion to continue the trial and motions to dismiss, all of which were denied.

For the next four days the trial progressed. On September 30, 1988, the supreme court granted Iyer's emergency motion and stayed the trial; the proceedings against Iyer were then abated.

On October 3, 1988, plaintiff filed with the supreme court her consolidated motion to vacate the order staying the trial, objections to the motion for leave to file a petition for a writ of *mandamus*, and a motion for sanctions against Iyer and his counsel. On October 4, 1988, Justice William Clark denied plaintiff's motion to vacate the emergency stay and set the remaining motions to be briefed and for decision by the full supreme court. On October 6, 1988, the trial judge declared a mistrial.

On November 1, 1988, the supreme court denied plaintiff's motion for sanctions, denied Iyer leave to file for *mandamus*, and vacated its earlier stay.

On November 7, 1988, Iyer filed a motion to transfer the case to Judge Nicholson and to set a discovery schedule. The motion recited the full appellate history of Iyer's motion to dismiss. After hearing arguments, Judge Foreman returned the case to the trial judge.

The trial judge ordered that the trial of both defendants begin on December 5, 1988. On November 10, 1988, Iyer filed a motion to vacate the trial date, to set a discovery schedule, and to transfer the motion to dismiss to Judge Nicholson for rehearing. On November 15, 1988, the trial judge set a discovery schedule, but refused to vacate the trial date and refused to transfer the motion to dismiss to Judge Nicholson.

Before trial commenced, plaintiff filed several motions *in limine* to preclude the introduction of any evidence concerning Jackson's possible intoxication at the time of the accident. Plaintiff asserted that

Jackson's possible intoxication was irrelevant to defendants' alleged failure to render treatment. Defendants responded that in a wrongful death action, the jury was entitled to know what type of person decedent was in order to properly assess damages. The court denied plaintiff's motion and ruled that evidence of intoxication would be admitted.

The second trial began on December 5, 1988. The jury heard evidence on several different occasions concerning decedent's possible intoxication. Roberto Lopez, one of the paramedics at the accident scene, testified that decedent was unruly and combative and told him he had been drinking heavily prior to the accident. Moreover, the paramedics' report of the accident reported that decedent was heavily intoxicated. Lopez acknowledged, however, that decedent's unruly behavior could also have been due to the fact that he was seriously injured and was having trouble breathing.

Dr. Singhal testified that decedent, when brought into the emergency room, was restless and uncooperative and stated that this could have been a sign that decedent was intoxicated. Dr. Singhal, however, admitted that restlessness and uncooperative behavior could also have been due to decedent's severe pain.

Both Dr. Gill and Pellerano testified that, according to the tests performed in the emergency room, decedent did not have any alcohol in his bloodstream. However, Pellerano testified that decedent could still have been intoxicated even though the blood-alcohol results were negative; if decedent had vomited prior to taking the test, the test results could have shown negative.

Similarly, defendants' expert, Larry Gunn, M.D., testified that it was possible that, if an intoxicated individual vomited prior to undergoing a blood-alcohol test, the results might be negative. Dr. Gunn, however, acknowledged that a patient's intoxication would not change the standard of care which a doctor renders.

Vincent Markovchick, M.D., plaintiff's expert, testified that decedent would not have had alcohol on his breath because his initial blood-alcohol was negative.

Sergeant Vernes Jones, who investigated the accident, testified that he saw decedent in the emergency room and that decedent was swinging his arms around and yelling. However, Jones could not say whether decedent was intoxicated.

During closing arguments, neither counsel for defendants mentioned decedent's possible intoxication. Rather, it was plaintiff's counsel who argued that defendants attempted to defend themselves on the basis that decedent was so drunk that he was not worth saving.

On December 15, 1988, the jury returned a verdict in favor of defendants, upon which the court entered judgment. Plaintiff filed a post-trial motion alleging that the verdict was not supported by the evidence and that the circuit court erred in permitting defendants to argue and present testimony concerning decedent's alleged intoxication. Plaintiff also filed a motion for sanctions against Iyer and his counsel. Following a hearing, the court denied both motions. It is from these orders that plaintiff appeals.

I

Plaintiff first maintains that the circuit court erred in denying her motion *in limine* to exclude testimony concerning decedent's alleged intoxication. Specifically, plaintiff contends that the evidence of intoxication was irrelevant and highly inflammatory. She argues that, though defendants stated that they would present evidence of intoxication to show the jury "what kind of person Mr. Jackson was"— whether he was a drinker or an alcoholic—in order to evaluate plaintiff's loss of companionship, defendants never presented competent evidence that decedent was intoxicated. Moreover, plaintiff argues, even if decedent was intoxicated on this one occasion, his intoxication would have been irrelevant regarding defendants' failure to render care.

■ In a personal injury negligence case, evidence of intoxication is admissible where it tends to show the negligence of one of the parties; in the absence of supporting evidence, testimony concerning the drinking of intoxicants should be stricken and, under certain circumstances, may constitute reversible error notwithstanding a sustained objection. (*Parrish v. Donahue* (1982), 110 Ill. App. 3d 1081, 1085, 443 N.E.2d 786.) However, irrelevant evidence of drinking is grounds for reversal only if it results in prejudicing the jury's verdict. *Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 914, 410 N.E.2d 249; *Coleman v. Williams* (1976), 42 Ill. App. 3d 612, 617, 356 N.E.2d 394.

In *Benuska v. Dahl,* the court found that irrelevant evidence that one defendant had thrown a can of beer out of a car after an accident was sufficiently prejudicial to require reversal. The court held that a mistrial should have been granted not only because the suggestion of drinking without proof was highly prejudicial, but because defendant was also denied a fair opportunity to rebut the allegation. In *Coleman v. Williams,* no evidence that the plaintiff was intoxicated was introduced, but evidence was admitted that plaintiff had spent some time in taverns on the day of the accident. The court held this to be reversible error.

■ However, where it appears an error did not affect the outcome of the trial, or where the reviewing court can see from the entire record that no harm has been done, the judgment will not be disturbed. (*Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 511, 524 N.E.2d 939.) Admission of evidence is largely a matter within the discretion of the trial court, and evidentiary rulings will not require reversal absent an abuse of discretion. (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 521, 505 N.E.2d 1239.) Moreover, a party is not entitled to a reversal based upon rulings on evidence unless the error was substantially prejudicial and affected the outcome of trial. (*Cairns v. Hansen*, 170 Ill. App. 3d at 511.) The burden is on the party seeking reversal to establish prejudice. *Cairns v. Hansen*, 170 Ill. App. 3d at 511.

In response to plaintiff's assertion that the intoxication evidence was irrelevant and inflammatory, defendants argue that the evidence was relevant to determine the monetary loss of decedent's society to his wife and children. For support, defendants offer cases where evidence was admissible concerning decedent's background relevant to proving an adult child's loss of society (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 505 N.E.2d 1239); concerning decedent's extramarital affairs relevant to the value of consortium (*Countryman v. County of Winnebago* (1985), 135 Ill. App. 3d 384, 481 N.E.2d 1255); and concerning duration, nature, and effect upon the marital relationship of husband's inability to sustain an erection (*Tjaden v. Moses* (1968), 94 Ill. App. 2d 361, 237 N.E.2d 562). Defendants do not, however, offer any support for their contention that evidence of a single incident of driving while intoxicated is relevant to a claim of loss of society.

Defendants also argue that plaintiff should be estopped from arguing that the evidence was prejudicial because plaintiff herself zealously injected evidence concerning intoxication into the trial. This argument is meritless as plaintiff offered this evidence only to rebut evidence of intoxication entered by defendants.

Defendants argue further that the evidence of intoxication did not so clearly influence the jury's verdict. They maintain that every instance of evidence of intoxication was countered by plaintiff. For example, when defendants attempted to show that decedent's unruly behavior was due to intoxication, plaintiff was able to elicit testimony which showed that such behavior could be explained by decedent's severe injuries. Moreover, plaintiff showed that decedent's blood-alcohol level was negative after being admitted to the emergency room. This argument is equally meritless; simply because plaintiff was able to dif-

fuse several instances of inflammatory evidence produced by defendants does not mean that the jury was not improperly influenced by such evidence.

■ Here, it is apparent that the evidence concerning decedent's intoxication was irrelevant and inflammatory. Decedent's intoxication had no bearing on the issue of whether defendants breached their standard of care. Furthermore, one instance of intoxication was not probative of the type of husband or father that decedent was, and was thus not relevant to the issue of damages for loss of society.

Correspondingly, the intoxication evidence did not serve to show that plaintiff's decedent was contributorily negligent. Although defendants raised the affirmative defense of contributory negligence in their answers, they produced no such evidence at trial. Although evidence of intoxication may be admissible to show contributory negligence (*Parrish v. Donahue* (1982), 110 Ill. App. 3d 1081, 443 N.E.2d 786), in the instant case it was error to allow such evidence at trial. Plaintiff was denied a fair trial in these circumstances, and a new trial must be granted.

In the instant case, intoxication is clearly not a necessary part of the cause of action, nor is it pertinent to the issue of damages. Decedent's ability to act with due care is likewise not a part of the cause of action where defendants' malpractice is alleged to be the cause of death. Accordingly, because of the prejudicial nature of the intoxication evidence, defendant may not introduce such evidence on retrial of this cause.

## II

Plaintiff next contends the circuit court erred in not granting her request for sanctions against Iyer and his counsel. Specifically, plaintiff contends that Iyer and his counsel, in bad faith, filed a groundless *mandamus* action in the supreme court; caused a stay of the first trial which resulted in a mistrial; filed a "series of groundless motions asking for different judges to rule upon matters already decided"; and misrepresented the procedural history of the case.

In ruling upon plaintiff's motion for sanctions, the court stated:

> "I think it's clear from my rulings that I didn't think that Dr. Iyer's position was well-founded. *** I will say that there was some basis because there wasn't much case law in this area *** perhaps this area was somewhat unsettled or unclear."

●■ ■ The grant or denial of a motion for sanctions rests within the sound discretion of the trial court. (Ill. Rev. Stat. 1987, ch. 110, par. 2—611, repealed by Pub. Act 86—1156, eff. Aug. 10, 1990; *Fried*

*v. Barad* (1989), 187 Ill. App. 3d 1024, 543 N.E.2d 1018.) Furthermore, as section 2—611 was penal in nature, its provisions had to be strictly construed. (*Diamond Mortgage Corp. v. Armstrong* (1988), 176 Ill. App. 3d 64, 530 N.E.2d 1041.) The burden of proving entitlement to fees and costs rests on the party seeking sanctions. (*Diamond Mortgage Corp. v. Armstrong*, 176 Ill. App. 3d at 71.) A petition for attorney fees and costs must meet minimum specificity requirements so that a responding party has an opportunity to challenge and defend against the allegations; the petition must specifically state which statements were falsely made and what fees were incurred as a result of such statements. *Geneva Hospital Supply, Inc. v. Sanberg* (1988), 172 Ill. App. 3d 960, 966, 527 N.E.2d 611.

 █ Here, plaintiff has failed to allege with specificity her motion for sanctions. Plaintiff avers in her request for sanctions that Iyer filed "a series of groundless motions." Plaintiff, however, does not state what, exactly, these motions were. Furthermore, plaintiff alleges that Iyer misrepresented "the procedural history of the case in both the Illinois Supreme Court and in subsequent motions." Here, again, plaintiff fails to specify what these "subsequent motions" were, nor does she specify how and where Iyer misrepresented the case.

Notwithstanding plaintiff's failure to address specific allegations of misconduct in her motion for sanctions, it does not appear that Iyer's petition for *mandamus* was entirely groundless. Iyer petitioned for *mandamus* on the grounds that he was not subject to the jurisdiction of the circuit court because plaintiff had failed to reinstate her case against him after the appellate court remanded the case. Iyer argued that he did not receive notice of the reinstatement of the case while plaintiff argued that the case was reinstated automatically and Iyer had notice. Both parties were unable to produce case law on this particular issue.

When the mandate of an appellate court, remanding a cause, is filed in the circuit court, jurisdiction is again vested in the circuit court. (*Bank of Viola v. Nestrick* (1981), 94 Ill. App. 3d 511, 514, 418 N.E.2d 515.) However, absent a showing that notice of reinstatement was sent or waived, the court should not proceed to take action in the case. *Bank of Viola v. Nestrick*, 94 Ill. App. 3d at 515.

Here, the parties disputed whether notice was actually sent to and received by Iyer or his counsel. Because plaintiff offered numerous letters which showed that Iyer and his counsel were informed of the case proceedings, Iyer's argument that no notice was received may be disingenuous. Nonetheless, the trial court did consider the imposition

474

of sanctions and refused to do so. We find no basis for concluding that the court abused its discretion in so ruling.

Accordingly, the judgment of the circuit court of Cook County denying plaintiff's motion for sanctions is affirmed; the judgment of the circuit court of Cook County denying plaintiff's motion *in limine* to exclude intoxication evidence is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

SCARIANO, P.J., and HARTMAN, J., concur.