Rule 23 order filed
April 26, 2023.
Motion to publish granted
May 26, 2023.

2023 IL App (5th) 220289

NO. 5-22-0289

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| ETTA MOORE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 17-L-80 |
| | ) | |
| TERESA MANDELL, | ) | Honorable |
| | ) | Christy W. Solverson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court, with opinion.
Presiding Justice Boie and Justice McHaney concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises out of a negligence and personal injury lawsuit from the circuit court of Jackson County. Following a five-day trial, the jury returned a verdict in favor of the plaintiff, Etta Moore, finding the defendant, Teresa Mandell, negligent and liable for the plaintiff's personal injuries and awarding her damages. The defendant now appeals that verdict and award arguing that the trial court erred when it barred (1) evidence and testimony related to the plaintiff's 2009 pre-accident right shoulder injury, (2) admission of evidence and testimony of statements the plaintiff made months before trial to her medical providers in which she denied having functional impairments that she later claimed at trial, and (3) admission of impeachment evidence and testimony of the plaintiff's medical expert, Dr. Rhode, regarding bias, prior disciplinary actions, communications with counsel, and expert history. The plaintiff's counsel has conceded that the

1

trial court erred in barring admission of impeachment evidence and testimony regarding Dr. Rhode, and thus, we reverse the trial court's judgment and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3     We initially note that for the sake of brevity and judicial economy we only recite the facts relevant and necessary to our disposition of this matter.

¶ 4                          A. General Facts and Pretrial History

¶ 5     The plaintiff in this matter was born with spina bifida that paralyzed her legs from the knees down. Despite not being able to walk, she learned to move around her house by crawling or by using her manual wheelchair. When moving about outside of her home, she often employed the aid of a motorized scooter. On September 30, 2015, an accident occurred involving a vehicle operated by the defendant and the plaintiff. The vehicle of the defendant struck the plaintiff, who at the time of the accident was traveling on her motorized scooter and attempting to cross a public roadway. The plaintiff was taken to a hospital nearby and treated for various injuries, including a dislocation to her right shoulder and severe pain. The plaintiff was admitted to the hospital and stayed until her discharge on October 2, 2015.

¶ 6     Following discharge from the hospital, she returned to her home. After a period of transition and limited recovery at home, the plaintiff was prescribed physical therapy for her injuries. The plaintiff participated in the physical therapy, but made limited progress. She was then referred to orthopedic surgeon, Dr. Treg Brown. After conservative treatment and monitoring over a few visits, Dr. Brown ordered an MRI of the plaintiff's injured shoulder. The MRI was completed on January 4, 2016, and Dr. Brown diagnosed, *inter alia*, a rotator cuff tear. He recommended the plaintiff undergo surgery to repair the rotator cuff. The plaintiff's rotator cuff repair surgery was

performed on March 25, 2016. Three and a half months later, the plaintiff was discharged following a visit with Dr. Brown on August 4, 2016.

¶ 7 Prior to her discharge from Dr. Brown's care, the plaintiff was undergoing physical therapy to rehabilitate her rotator cuff and shoulder. She continued with this therapy following her discharge. As time passed, the plaintiff began to develop issues relating to the right side of her neck, including pain and soreness, and left shoulder pain.

¶ 8 On September 19, 2017, the plaintiff filed the instant action against the defendant alleging that, as a result of the defendant's negligence, the plaintiff "sustained serious and permanent injuries; was required, [and] will be required in the future, to seek extensive medical consultation and treatment; has expended and will in the future continue to expend great sums of money to be healed and cured of her maladies; [and has] suffered and will in the future continue to suffer great pain, anguish and suffering."

¶ 9 During the pendency of this lawsuit, the plaintiff was then referred to a pain management specialist, Dr. Akshay Vakharia, by her primary care physician. The plaintiff's first visit with Dr. Vakharia occurred on August 9, 2018. Dr. Vakharia had the plaintiff continue her previously prescribed pain medication and additionally prescribed a trigger point injection in the plaintiff's deltoid muscle to reduce the neck pain and shoulder pain.

¶ 10 On September 4, 2019, following continuing pain and other problems with her right shoulder, the plaintiff met with orthopedic surgeon, Dr. Blair Rhode, for a second opinion regarding her injuries. Dr. Rhode ordered an MRI and concluded from the MRI image that the plaintiff's right shoulder rotator cuff had healed. He recommended the plaintiff see a physical therapist if the pain worsened and indicated there was no further treatment option available but

physical therapy for the ongoing pain in the right shoulder. The plaintiff only met with Dr. Rhode on one occasion.

¶ 11                                B. Pretrial Discovery and Rulings

¶ 12    The plaintiff in her discovery deposition testified that she had no prior problems with her right shoulder before the accident. However, during discovery, the defendant obtained medical records which indicated that in 2009 the plaintiff sustained an injury to her right shoulder when she was moving her wheelchair out of her vehicle. Following the injury, the plaintiff reported to the Memorial Hospital of Carbondale emergency room and related complaints about her right shoulder. An x-ray was completed which disclosed no evidence of acute fracture, or dislocation, but disclosed mild hypertrophy of one joint. The medical records indicated that the plaintiff had been diagnosed with "right shoulder pain—likely rotator cuff injury vs. strain." Based upon the available record, this is the only medical visit that the plaintiff had related to her right shoulder until after the 2015 accident.

¶ 13    Multiple motions *in limine* were filed by both parties prior to trial regarding the evidence depositions taken by the parties. Relevant to the issues at hand, the trial court struck the defendant's cross-examination of Dr. Rhode regarding Dr. Rhode's communications with the plaintiff regarding preparation of an expert report prior to becoming a treating physician of the plaintiff, Dr. Rhode's professional reprimands, Dr. Rhode's prior work as a hired expert physician for plaintiffs and claimants, and Dr. Rhode's financial compensation derived from expert litigation work.

¶ 14                                        C. Trial

¶ 15    On December 6, 2021, following an admission of negligence on the part of the defendant, the trial in this matter commenced before a jury on damages. During the trial, it was undisputed

4

that the plaintiff suffered a dislocation of her right shoulder because of the 2015 accident. It was further undisputed that in 2016, after the accident, the plaintiff was discovered to have a right shoulder rotator cuff tear which required surgery to repair. Disputed among the parties, however, was whether the plaintiff's right shoulder rotator cuff tear was caused by the accident or whether it was a result of a prior alleged injury which occurred in 2009. Also disputed was whether the plaintiff made a full recovery following the surgical repair of her rotator cuff or if she continued to have ongoing pain and functional limitations even after recovery from the surgery.

¶ 16 During the trial, the plaintiff called a number of witnesses to testify, including medical providers and relatives. For brevity, we do not recite the testimony of the witnesses not relevant to the resolution of this disposition.

¶ 17 Dr. Michael Chipman testified that he was the emergency room physician who treated the plaintiff at Carbondale Memorial Hospital following the 2015 accident. He testified that the plaintiff presented to him with right shoulder pain and abrasions to her body. She complained of pain and was given morphine, and eventually Dilaudid, to keep her pain under control. He diagnosed her with a right shoulder dislocation. He testified that following sedation, the plaintiff's right shoulder was put back into place. He then testified that the plaintiff was admitted to the hospital for further treatment and observation as a result of her continued high level of pain and inability to use her upper arms, especially in combination with her spina bifida, which led to a general fear of her ability to take care of herself. He did not treat her after that visit, and he did not offer any opinions on her recovery or other alleged injuries.

¶ 18 Dr. Quincy Scott, a family care physician with SIU Family Medicine, testified that he also treated the plaintiff. He testified that while in the hospital following the 2015 accident, the plaintiff was treated with regular doses of IV pain medication, but that she still reported high pain, such as

5

"10/10" and "8/10." He testified that he ordered physical and occupational therapy evaluations and treatment for the plaintiff while she was in the hospital. He then discharged the plaintiff with pain medication and prescriptions for home physical therapy, a Hoyer lift, to aid her in getting in and out of bed, and a bedside commode. Dr. Scott then testified regarding the plaintiff's subsequent visits to his office where she was seen by various medical providers. He testified that he would defer his opinion on any orthopedic issues to the orthopedic specialists who treated her. He did not offer any testimony as to the plaintiff's recovery or injuries at the time of the trial, nor any opinions as to future issues.

¶ 19     Dr. Treg Brown, an orthopedic surgeon, testified that he regularly treats rotator cuff injuries and performs rotator cuff surgeries. He testified generally regarding his treatment of the plaintiff. Specifically, Dr. Brown testified that after his initial visit with the plaintiff, he ordered her to place her right arm in a sling and rest it for four weeks. During this time, he also had the plaintiff start physical therapy to regain some range of motion and stabilize the shoulder area.

¶ 20     Dr. Brown then testified that at the next medical visit, the plaintiff had "improved relative to our initial visit" so he ordered her to continue physical therapy and return in another month to see how she progressed. At the third visit, the plaintiff still had decreased range of motion in the shoulder, as well as muscle weakness. As a result, Dr. Brown ordered an MRI of the right shoulder. He testified that he doubted the plaintiff had a significant rotator cuff injury prior to the accident because she did not have any ongoing prior complaints before to the 2015 accident. He testified that he wanted to treat the shoulder conservatively at first because the plaintiff used her shoulder for weight bearing due to her spina bifida and needed the shoulder to operate her wheelchair. Thus, he held an added concern regarding rotator cuff surgery because he knew the plaintiff would be

essentially immobilized during her recovery to prevent damage to the newly repaired shoulder. Ultimately, after further consultation, the plaintiff decided to move forward with surgery.

¶ 21     Dr. Brown testified that he performed the rotator cuff surgery on March 25, 2016. He testified that the surgery revealed, *inter alia*, that the plaintiff had a "large to massive" sized rotator cuff tear in the right shoulder. He testified that he believed a return to 80% function to be a success for the plaintiff. He also believed that given the degree of the plaintiff's tear and her age, she was at an increased risk for some future problem with the repaired rotator cuff as opposed to her other normal shoulder. When asked specifically if the noninjured side was more likely to tear due to overcompensation, Dr. Brown declined to agree, stating that it "would be difficult to say."

¶ 22     Dr. Brown then testified regarding the plaintiff's progress and her physical therapy. He indicated that her physical therapy notes indicated she was progressing and that during her recovery she had a family member who lived with her. On August 4, 2016, during his last visit with the plaintiff, he recalled the plaintiff was doing much better. When asked if the plaintiff had reached maximum medical improvement, he replied that he felt the plaintiff "would very likely continue to improve given the trajectory of her improvement and the fact that she was only three and a half months out from surgery." He then went on to state that he was not sure if the shoulder would be "exactly the same" as before the accident, "but certainly everything had done well enough and healed well enough for her to return to her pre-injury activities." He then testified that based upon a physical therapy note, the plaintiff had asked to be discharged from physical therapy on July 28, 2016, a few days before her visit with him, stating "I want physical therapy to be done now." He then ended his testimony by stating that the plaintiff had not returned to him for any additional treatment or relayed any concerns, and that he was unaware of her current condition at the time of the trial. He offered no testimony as to her future prognosis.

7

¶ 23    Dr. Khalid Sonbol testified that he was a hospitalist licensed in Illinois and Minnesota. During his residency at Southern Illinois University and while working for Southern Illinois Family Medicine Center, he treated the plaintiff. He testified that the plaintiff had a significant amount of pain during her stay at the hospital following the 2015 accident. He testified that it was difficult to keep her pain under control and that it was not typical for a shoulder dislocation alone to cause that much pain. He testified that during her visits with the SIU Family Medicine group prior to the accident, the plaintiff never reported any right shoulder pain complaints. Complaints regarding the plaintiff's right shoulder only appeared after the 2015 accident. He offered his medical opinion that based upon his examination of the patient, he believed the 2015 accident caused her rotator cuff tear. He testified that he was the physician who completed the plaintiff's preoperative evaluation for her rotator cuff surgery. He stated that following surgery, Dr. Brown would be the physician primarily responsible for addressing the plaintiff's right shoulder complaints and monitoring her recovery. He testified that based upon the medical records from the plaintiff's visits with SIU Family Medicine from June of 2016 through August 2017, there were no noted complaints of right shoulder pain made by the plaintiff. He gave no testimony as to the plaintiff's current status at the time of the trial or any future pain and suffering.

¶ 24    Dr. Akshay Vakharia, a pain management physician, testified that he had a consultation with the plaintiff on August 9, 2018. The plaintiff was referred to him for neck pain and right shoulder pain. The plaintiff also reported that her activities were restricted by the injury. Dr. Vakharia testified that the plaintiff's paraspinal muscles were tender and the muscles were spasming, especially in the deltoid. When the plaintiff appeared to him, she was taking prescribed pain medication and muscle relaxant medication. He only treated the plaintiff on one occasion, and he recommended a medial nerve block injection to help with her neck and shoulder pain. He

8

further testified that the plaintiff relayed to him that she had experienced pain since the 2015 accident and following the surgery, but he noted that something had occurred approximately three months prior to the visit which aggravated those injuries resulting in the consultation. He was not sure what led to the increased pain and aggravation. He offered no opinions relating to her condition at the time of trial nor any opinions as to future pain and suffering.

¶ 25    Christopherson Caro, a physical therapist who treated the plaintiff, also testified. He testified regarding his care for the plaintiff prior to her surgery and his treatment of her postsurgery during her recovery. He testified that on the day the plaintiff was discharged that she reported no pain in her right shoulder, but he clarified that, "it doesn't mean that she won't have any pain in the future. Just on that day she had no pain on that day." He further testified that the plaintiff had previously reported she had no difficulty doing her usual hobbies.

¶ 26    Dr. Blair Rhode, an orthopedic surgeon, testified that he had one visit with the plaintiff on September 4, 2019. He testified that the plaintiff came to see him seeking a second opinion after her surgery with Dr. Brown. He offered testimony that the more severe the rotator cuff tear, generally the worse the patient outcomes. Also, he stated that some research studies suggested that large to massive tears such as the plaintiff's "have a recurrence rate of as high as 90 percent." He testified that not only did the accident cause her rotator cuff tear and the issues previously discussed, but he also believed it resulted in a cervical neck strain and injury. He testified that in 2019 the plaintiff had "residual symptomatology" or "residual deficits," despite the shoulder surgery, and that those lingering issues were related to the 2015 accident. He also testified that he discovered that the plaintiff had developed compensatory left shoulder pain and cervical pain. The compensatory left shoulder pain and cervical pain, according to Dr. Rhode's testimony, occurred because the plaintiff was using her left side or arm to compensate for injury or pain located on her

9

right side. He testified that he did not believe the plaintiff had a previous rotator cuff tear because there were no records indicating ongoing issues with that shoulder prior to the 2015 accident. He testified that it was his medical opinion that "even though she has *** successful rotator cuff repairs delineated by the postoperative MRI showing no retear, it's my opinion the patient has moderate to significant functioning deficits due to this [2015] accident." Dr. Rhode then testified that based upon his examination of the plaintiff, he believed to a reasonable degree of medical certainty that the right shoulder and neck injuries she sustained from the 2015 accident were permanent. On cross-examination, Dr. Rhode testified that he saw the plaintiff in his satellite office in Peoria, Illinois, and only saw her once for approximately 10 to 15 minutes.

¶ 27    Following the plaintiff's case-in-chief, the defendant presented a single expert witness, orthopedic surgeon, Dr. Gary Klaud Miller. Dr. Miller testified that the plaintiff dislocated her shoulder in the 2015 accident. He agreed the shoulder dislocation would be painful and that the plaintiff would have limitations for a period of time. He gave his medical opinion that he believed she did not tear her rotator cuff because of the 2015 accident, but that the tear occurred as a result of general degenerative changes due to the plaintiff's age and high use of her arms. He did concede that during his 2020 examination of the plaintiff, she did complain of right shoulder pain; however, he believed she was "magnifying her symptoms." He also did not believe that the healed rotator cuff was still causing any of the plaintiff's pain or injuries; instead, he believed that the pain she now experienced stemmed from AC joint arthritis.

¶ 28    Closing arguments were then given by the parties. In closing arguments, the plaintiff's counsel made the following requests of the jury:

"For loss of a normal life experienced over the last six years, I would suggest a figure in the amount of $500,000. These permanent limitations will continue to confine

10

[the plaintiff's] life without her permission and it is going to deny her the enjoyment she worked so hard for every moment of her life. It will be for the rest of her life. It is not because I said it, it is her independent doctors that said it. We suggest $560,000 would be a place to consider as a starting point.

The next element of damages is for the pain and suffering experienced as a result of the injuries. *** For that pain that [the plaintiff] has endured since the date of the crash until today, we suggest an amount $450,000. The thing about chronic pain is that it is just that, it is chronic. We know where it began for [the plaintiff], but it will have no end. Dr. Rhode testified that [the plaintiff's] pain is permanent. This is her new normal. For the pain and suffering that [the plaintiff] is certain to continue to experience into the future, we suggest that $250,000 would be a place to consider as a starting point for you."

¶ 29                                                 D. Posttrial

¶ 30    Following the trial, the jury returned the following itemized verdict in favor of the plaintiff:

"We assess the damages in the sum of $818,655.03. Loss of a normal life experience and reasonably certain to be experienced in the future: $350,000; Pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries: $350,000; The reasonable expense of necessary medical care, treatment and services received, $118,655.03."

¶ 31    On January 20, 2022, the trial court entered judgment *nunc pro tunc* on the jury verdict in the amount of $818,655.03 and also awarded the plaintiff prejudgment interest, without objection. The defendant filed a postjudgment motion for a new trial or, in the alternative, to amend judgment arguing the issues stated on appeal. On April 12, 2022, the trial court in a docket order entry denied the defendant's postjudgment motion. This timely appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33    Numerous issues are raised by the defendant on appeal; however, the plaintiff has admitted

one of those issues to be error during oral argument before this court. Thus, we first turn our

attention to that issue. The defendant claims that the circuit court erred when it excluded

impeachment evidence and testimony of the plaintiff's medical expert, Dr. Rhode, regarding bias,

prior disciplinary actions, communications with counsel, and his previous work as a medical expert

in litigation. The plaintiff has conceded that the circuit court erred in not allowing the defendant

to introduce this evidence. We agree with both the defendant and plaintiff that the circuit court

erred in limiting the defendant's cross-examination of Dr. Rhode.

¶ 34    "A reviewing court will not reverse a circuit court's decision with respect to a motion for

a new trial unless it finds that the circuit court abused its discretion." *York v. Rush-Presbyterian-*

*St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006). "[A] trial court abuses its discretion only

if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of

reason and disregards recognized principles of law, or if no reasonable person would take the

position adopted by the trial court." *Campbell v. Autenrieb*, 2018 IL App (5th) 170148, ¶ 26. "If

the trial court's decision rests on an error of law, then it is clear that an abuse of discretion has

occurred, as it is always an abuse of discretion to base a decision on an incorrect view of the law."

(Internal quotation marks omitted.) *Id*. However, "[e]rroneous evidentiary rulings are only a basis

for reversal if the error was 'substantially prejudicial and affected the outcome of trial.' "

*Ittersagen v. Advocate Health & Hospitals Corp*., 2020 IL App (1st) 190778, ¶ 71 (quoting

*Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 192). "We will not reverse

if it is apparent that 'no harm has been done.' " *Id*. (quoting *Jackson v. Pellerano*, 210 Ill. App. 3d

464, 471 (1991)). "Importantly, '[w]hen erroneously admitted evidence is cumulative and does not

12

otherwise prejudice the objecting party, error in its admission is harmless.' " *Id.* (quoting *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1013 (2005)). " 'The burden rests with the party seeking reversal to establish prejudice.' " *Id.* (quoting *Watkins v. American Service Insurance Co.*, 260 Ill. App. 3d 1054, 1065 (1994)).

¶ 35    First, it appears the circuit court limited the cross-examination based upon a believed distinction between treating physicians and controlled expert witnesses under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018). Specifically, the circuit court held that a treating physician is subject to a narrower scope of cross-examination as a result of how that physician became involved in the case. However, contrary to the circuit court's ruling, defendants are entitled to the same scope of cross-examination of a treating physician as they are of a controlled expert. *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 890 (1992) ("an opposing party should have the same ability to cross-examine a treating physician that he would have in cross-examining a retained expert"). The distinction between an independent and a controlled expert witness "applies only to the method of disclosure, rather than the substance of the testimony." *Id.* Thus, Illinois law guarantees that, regarding the substance of expert cross-examination, the opposing party "must be given the widest latitude during cross-examination to demonstrate any interest, bias, or motive of the expert witness to testify, and to test his accuracy, recollection and credibility." (Internal quotation marks omitted.) *Jackson v. Reid*, 402 Ill. App. 3d 215, 234 (2010). More specifically, our courts have held that evidence tending to show bias, prior dealings, or that otherwise calls into question the relationship between the plaintiff's counsel and a treating physician is squarely within the scope of cross-examination. See, *e.g.*, *Noel v. Jones*, 177 Ill. App. 3d 773, 780 (1988) ("Certainly it was proper for the jury to consider the 'steady stream of lucrative referrals' from

13

plaintiff's attorney to the treating physicians when evaluating the credibility, bias, and financial interest of the physicians." (quoting *Sears v. Rutishauser*, 102 Ill. 2d 402, 410 (1984))).

¶ 36 To plaintiff's counsel's credit, he admitted this during oral arguments in front of this court:

"I think that there are some points that in all reality that need to be conceded *** let me address for a moment the—the issue of cross-examination of Dr. Rhode. In regard to that issue, I'll have to concede, that it was—it had to be an abuse of discretion for the judge to bar completely any cross-examination of Dr. Rhode. Because there was simply no law supporting it and there was law contrary to it that a treating physician should be subject to cross-examination to some of the items that were laid out."

¶ 37 The plaintiff went on to argue that despite the error by the circuit court, the opportunity missed by the defendant to fully cross-examine Dr. Rhode when taken as a whole with the other testimony did not result in prejudice to the defendant and did not materially affect the outcome of the trial. Specifically, the plaintiff argued that the nature of the plaintiff's pain and suffering as evidenced over the previous years was sufficient to justify the $818,655.03 award. As previously stated, this court will not reverse a decision concerning the admissibility of evidence unless the circuit court abused its discretion and the decision had prejudicial effect. *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 630 (2007). Thus, while we have found an abuse of discretion on the part of the circuit court relating to its limitation of the defendant's cross-examination of Dr. Rhode, we must now determine if the error was such that it prejudiced the defendant. We conclude that it did.

¶ 38 First, we note the subjects the defendant was prohibited from addressing in the cross-examination of Dr. Rhode due to the circuit court's ruling. The defendant was unable to present evidence relating to Dr. Rhode's professional disciplinary reprimands, Dr. Rhode's previous history of serving as a controlled expert witness for plaintiffs and claimants, that Dr. Rhode

14

continues to earn a substantial amount of income from that expert work on behalf of plaintiffs and claimants, that communications existed between Dr. Rhode and the plaintiff's counsel which appeared to address the subject of his medical opinions, that communications existed wherein plaintiff's counsel appeared to request to pay Dr. Rhode to author a written report prior to him becoming a treating physician of the plaintiff, and that communications existed wherein plaintiff's counsel sought an opinion from Dr. Rhode that the plaintiff may need to be confined to a nursing facility as a result of the accident. This court finds that the failure of these pieces of evidence to be presented to the jury is prejudicial to the defendant because the information could have impacted the jury's perception of Dr. Rhode's credibility and impartiality. Further, there is evidence that the circuit court also felt these subjects were at least relevant to the jurors in their decision-making because the judge allowed cross-examination of the defendant's controlled expert witness by the plaintiff as to many of the same issues, including professional reprimands, prior expert work, and financial compensation.

¶ 39    Second, and most importantly, Dr. Rhode is the only medical provider to offer a firm, outright medical opinion on the permanent nature of the plaintiff's injuries, to relate a cervical strain/injury from the 2015 accident, and to testify that the plaintiff was medically certain to have continued pain and suffering from the 2015 accident. He also was the only physician who testified that he believed that the plaintiff's subsequent left shoulder pain was compensatory pain from overuse due to the injury to her right shoulder. He was the only physician who testified that the plaintiff was likely to suffer a rotator cuff injury to her other arm because of the injury to her right shoulder. Thus, it is apparent from the record that Dr. Rhode's testimony was crucial to the plaintiff's ability to seek a significant recovery for certain portions of past pain and suffering and loss of a normal life and the entirety of future pain and suffering and loss of a normal life.

15

¶ 40    As noted above, the plaintiff requested specific amounts of money for loss of a normal life and for future pain and suffering.

"For loss of a normal life experienced over the last six years, I would suggest a figure in the amount of $500,000. These permanent limitations will continue to confine [the plaintiff's] life without her permission and it is going to deny her the enjoyment she worked so hard for every moment of her life. It will be for the rest of her life. It is not because I said it, it is her independent doctors that said it. We suggest $560,000 would be a place to consider as a starting point.

The next element of damages is for the pain and suffering experienced as a result of the injuries. *** For that pain that [the plaintiff] has endured since the date of the crash until today, we suggest an amount $450,000. The thing about chronic pain is that it is just that, it is chronic. We know where it began for [the plaintiff], but it will have no end. Dr. Rhode testified that [the plaintiff's] pain is permanent. This is her new normal. For the pain and suffering that [the plaintiff] is certain to continue to experience into the future, we suggest that $250,000 would be a place to consider as a starting point for you."

Combining the two elements of loss of a normal life and pain and suffering, the plaintiff asked for an award of $950,000 for the plaintiff's loss of a normal life and pain and suffering from the time of the accident to trial and $810,000 for the plaintiff's future loss of a normal life and pain and suffering. Of the total, the plaintiff asked for 46% of the award to be for future problems that the plaintiff would experience. That is a significant amount. While the jury verdict did not separate past and future loss of a normal life and pain and suffering, it is reasonable to assume that a portion of the $800,000 plus award was for the plaintiff's future problems, thus prejudicing the defendant.

16

¶ 41    Lastly, we note that during closing arguments, the plaintiff relied heavily on the testimony offered by Dr. Rhode. Plaintiff's counsel specifically referred to Dr. Rhode a total of 17 times during closing arguments. Plaintiff's counsel referred to all of the plaintiff's other medical providers a combined total of 23 times. Thus, it is clear that plaintiff's counsel sought to emphasize the importance of Dr. Rhode's testimony. Again, this court "will not reverse if it is apparent that 'no harm has been done.' " *Ittersagen*, 2020 IL App (1st) 190778, ¶ 71 (quoting *Jackson*, 210 Ill. App. 3d at 471). " '[W]hen erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless.' " *Id.* (quoting *Greaney*, 358 Ill. App. 3d at 1013). However, here, where we find that Dr. Rhode offered opinions not otherwise given by any other medical providers, and where the plaintiff's orthopedic surgeon's testimony offered a better overall opinion of the plaintiff's outcome, we find that the failure of the trial court to allow a full cross-examination of Dr. Rhode was prejudicial to the defendant and reversal is warranted.

¶ 42    Because reversal is required for this issue, it is not necessary to fully analyze the remaining issues alleged by the defendant. It is apparent from a review of the record and the briefs on appeal that the circuit court and the parties are well versed and aware of the relevant case law and controlling precedent on these issues. It is not directly evident that any of the remaining issues will arise again on remand; however, we trust that if one or more should, the trial court will apply the law properly.

¶ 43                                    III. CONCLUSION

¶ 44    Accordingly, due to the conceded error on the part of the trial court by the plaintiff's counsel in light of the clearly controlling legal precedent and given the prejudicial nature of the

testimony offered by Dr. Rhode which affected the outcome of the trial, we reverse the trial court's judgment and remand for a new trial.

¶ 45    Reversed and remanded for new trial.

*Moore v. Mandell*, **2023 IL App (5th) 220289**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, No. 17-L-80; the Hon. Christy W. Solverson, Judge, presiding. |
| **Attorneys for Appellant:** | Adam S. Johnson, Nicholas C. Martin, and Michael C. Schroer, of Lewis, Brisbois, Bisgaard & Smith, LLP, of Edwardsville, for appellant. |
| **Attorneys for Appellee:** | Clyde L. Kuehn, of Mathis, Marifian & Richter, Ltd., of Belleville; and Olivia N. Schwartz and Kristin Barnette McCarthy, of Kralovec, Jambois6 & Schwartz, of Chicago, for appellee. |