2025 IL App (1st) 240286-U

Fourth Division
Filed August 28, 2025

No. 1-24-0286

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| SALVADOR GUTIERREZ,<br><br>　　Plaintiff-Appellant,<br><br>v.<br><br>THE CITY OF CHICAGO, a Municipal Corporation,<br><br>　　Defendant -Appellee. | Appeal from the<br>Circuit Court of Cook County<br><br>No. 2019 L 000533<br><br>The Honorable Daniel A. Trevino,<br>Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1　　*Held*:　The judgment was affirmed where the general verdict rule would allow us to affirm because there is evidence to support the City's theory of comparative negligence; and plaintiff was not prejudiced by the trial court prohibiting him from playing post-accident footage.

¶ 2　　This matter arises from a negligence action filed against the City of Chicago, alleging that the City's failure to maintain a traffic signal light caused a crash that resulted in bodily injury to plaintiff Salvador Gutierrez.

¶ 3　　　　　　　　　　　　　I.  BACKGROUND

¶ 4　　On January 16, 2019, Salvador Gutierrez filed a lawsuit against the City of Chicago and Monica Ochoa, the driver of the SUV vehicle he crashed into, seeking recovery for injuries he

sustained during a traffic incident. On April 11, 2019, an amended complaint was filed, alleging that the City was negligent for not repairing the traffic control lights at the intersection in question before the accident and for allowing the lights to function improperly. The City filed an answer to the complaint denying that the City negligently failed to repair the lights at the intersection in question and asserted Gutierrez's comparative negligence as an affirmative defense. During discovery Gutierrez named Gordon Meth as a liability expert and disclosed his opinions on August 18, 2021.

¶ 5      Ochoa was subsequently dismissed from the case, and Gutierrez proceeded to a jury trial against the City.

¶ 6                    A. The City's Assertion of Immunity

¶ 7      A hearing on motions *in limine* was set for the Friday before trial, and the parties exchanged their motions the afternoon before. Relevant here, the City sought to bar Gutierrez's expert, Gordon Meth, from testifying as to his opinions that the City should have (1) placed a sign at the intersection where the collision occurred warning drivers that left-turn arrows were not active at night, (2) inspected the traffic signal at that intersection to ensure it was operating correctly at nighttime, and (3) chosen a single, round-the-clock signal plan rather than having a different signal plan in place during nighttime hours. The City argued that this evidence should be barred because it was immune from liability under various provisions of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 to 10-101 (West 2018)).

¶ 8      At the hearing on the motions *in limine*, the City also orally moved for leave to amend its answer to raise affirmative defenses under the Tort Immunity Act, which corresponded to its assertions that the testimony relating to certain of Meth's opinions should be barred based on the Tort Immunity Act under section 2-201 and 3-104. (745 ILCS 10/2-201, 3-104 (West 2018)). The City claimed that the proposed amendment was aimed at countering any theories Meth might present at trial. Gutierrez said that he was prepared for trial and it should proceed as planned.

Gutierrez further asserted that an amendment to the answer raising new affirmative defenses at this stage would be highly prejudicial and untimely and therefore should be denied. In reply, the City argued that because Meth's opinions emerged during discovery, it had not needed to assert the immunity affirmative defenses in its original answer. The City further argued that the affirmative defenses revealed the basis for its motions *in limine* that sought to prevent the admission of evidence that related to alleged negligent acts which were immune from liability. The court pointed to section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616 (West 2018)), which permits parties to amend their pleadings at any time before final judgment is rendered on just and reasonable terms. The court further noted that amendments to pleadings should be liberally allowed so that cases could be decided on the merits, and it referenced the relevant factors as those set forth in *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263 (1992). It granted leave to amend "based on the information available to the court."

¶ 9     The court then ruled on the motions *in limine*. Relevant here, it granted in part and denied in part the City's motion to exclude evidence about prior inspections, permitting Gutierrez to introduce evidence pertaining to an inspection that had taken place the night before the incident but barring evidence about any previous inspections under section 3-102 of the Tort Immunity Act. (745 ILCS 10/3-104 (West 2018)). It also granted the City's motion to bar Meth from opining on its decision to implement a different signal plan at nighttime.

¶ 10     On the morning of trial, Gutierrez filed a written motion to strike the City's Tort Immunity Act defenses, arguing that the motion to amend did not meet the requirements of *Loyola Academy*. The trial court denied the motion to strike.

¶ 11                               B. Evidence Presented at Trial

¶ 12                               1. The Collision

¶ 13     In general, the evidence at trial showed that, on June 15, 2018, at around 9:45 pm, Gutierrez was riding his motorcycle eastbound on West Archer Avenue in Chicago. As Gutierrez approached the traffic light at the intersection of Archer and South Mayfield Avenue, he changed lanes from

the left lane to the right lane. The light for eastbound Archer was red as Gutierrez neared the intersection. Meanwhile, a Kia SUV driven by Ochoa was stopped in the left turn lane on westbound Archer, which also had a red light, preparing to turn left into a Jewel Osco parking lot connected to southbound Mayfield. Joshua Trujillo, a passenger in Ochoa's car, and Chicago police officer John Weinert, who was approaching the intersection in a patrol car headed westbound on Archer, witnessed the subsequent collision between Gutierrez's motorcycle and Ochoa's SUV.

¶ 14    When the lights for westbound Archer turned green, a yellow left-turn arrow—not a green one—illuminated at the same time. Ochoa began executing a left turn, while the cars in the two eastbound lanes of Archer remained stopped. While Ochoa was making the turn, the yellow arrow turned off. Meanwhile, Gutierrez bypassed the halted eastbound cars by riding along the curbside and entered the intersection before Ochoa had cleared it. He collided with the front right side of Ochoa's vehicle.

¶ 15    Officer Weinert and his partner, Officer Matthew Bos, went to Gutierrez's aid, and they were shortly joined by other first responders, who ultimately took Gutierrez to a hospital for his injuries to be treated. Both officers activated their body-worn cameras. The footage was entered into evidence and played for the jury. Among other things, the footage from those cameras incidentally depicted the operation of the traffic lights at the intersection over the next several minutes after the collision.

¶ 16                     2. Testimony of James Kozik

¶ 17    James Kozik, a light technician for the City of Chicago, testified that on the night of June 14, 2018, at around 9:45 p.m.—24 hours prior to the collision—he was patrolling the area to check for any traffic light problems. Kozik admitted to not having an independent recollection of the evening, so his testimony was based on his documentation of that night's work.

¶ 18    According to Kozik, while patrolling, he noticed that, although the traffic lights otherwise appeared to be operating normally, one of the green bulbs in the traffic light at the intersection of Archer and Mayfield was not functioning, so he stopped to investigate. During his investigation,

he noted that the controller—which, he explained, was a computer found in the traffic box that controlled the operation of the traffic lights at the intersection—had lost power at some point. Kozik retimed the intersection, meaning he checked the date, time, and cycle time to verify that the controller's timing was properly synchronized with other traffic lights on the same "pulse" as the ones at Archer and Mayfield. He then walked to each corner of the intersection to observe the lights to make sure each one was cycling through. Consistent with the nighttime plan for that intersection, he did not observe any turn arrows. He denied having reprogrammed the lights during his stop, explaining that changing the signal plan for the intersection was something that required approval from the engineering staff; he could not make the decision to reprogram the lights on the spot.

¶ 19    At one point during Kozik's testimony, Gutierrez sought to play the footage from the body-worn camera of officers Weinert and Bos which showed that after the collision the yellow left turn arrow was sometimes illuminating. The City objected, citing the *in limine* order which barred evidence of subsequent remedial measures. The trial court sustained the objection.

¶ 20                    3.  Testimony of Gordon Meth

¶ 21    Following the conclusion of James Kozik's testimony, Gutierrez called his expert, traffic operations engineer (TOE) Gordon Meth. A TOE assists in coordinating traffic and transportation engineering activities, including traffic systems, to improve traffic flow, increase roadway and intersection capacity, reduce traffic accidents, and promote neighborhood traffic management. When Gutierrez introduced Meth as an expert, the City raised no objections. Meth described the Manual on Uniform Traffic Control Devices (MUTCD) as the standard for traffic control devices. Published, maintained, and incorporated into law by the federal government, it mandates compliance by all states. Meth stated that the MUTCD served as the foundation for all of his work, and he was very familiar with it. He was unaware of any American municipality that was exempt from the MUTCD's requirements.

¶ 22 Meth testified that the MUTCD does not specify an exact duration for green arrows but rather delegates this authority to the implementing agency. According to the MUTCD, the recommended duration for a yellow light may vary from three to six seconds based on the speed limit of the route. Furthermore, as stated in his testimony, Meth indicated that a green arrow is required to precede a yellow arrow in compliance with Sections 4D.04 and 4D.05 of the MUTCD.

¶ 23 Meth explained that the timing scheme for the lights at Archer and Mayfield followed a bimodal schedule. Between the 6:00 a.m. and 9:00 p.m., the timing scheme provided for a "demand activated" left-turn signal: if sensors detected the presence of a vehicle in the left turn lane, then the light cycle would go through a short sequence that included a green and then yellow left-turn arrow. Otherwise, it would not display any turn arrows. During the overnight hours, the timing scheme provided for no left-turn signals.

¶ 24 At one point, Meth opined that including a left-turn phase during the day but not at night violated the MUTCD. Citing section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2018)), the City objected, arguing that it was immune from liability for discretionary policy determinations. The court agreed, sustaining the objection. The City then asked the court preemptively to bar Meth from opining that the City had failed to "properly install" the lights at Archer and Mayfield in that they should not have been programmed to display a yellow left-turn arrow without a preceding green one. The City argued that it was immune from liability under section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2018)) for any failure to initially provide a traffic control device. The court agreed, but it clarified that Meth could still opine that the city had not properly maintained the light after its installation.

¶ 25 Ultimately, Meth was allowed to testify in accordance with the trial court's evidentiary rulings that the lights at Archer and Mayfield did not match the City's intended bimodal timing program on the night of the accident because a yellow left turn signal had appeared in place of no left turn signals. Meth also testified that he believed the yellow turn arrow was displayed when it should not have been because the City failed to maintain the Archer and Mayfield lights.

¶ 26 Later during Meth's testimony, Gutierrez requested permission from the trial court to show the body-worn camera footage, explaining that the video showed how the lights continued to malfunction and wanted to ask Meth for his opinion on the programing of the lights. The City opposed Gutierrez's request, arguing that the footage was "more prejudicial than probative" because it was "after the accident." The court agreed and denied Gutierrez's request, saying, "any video or testimony seeking the subsequent operation is going to be excluded." Meth subsequently testified, while viewing the dash cam footage, that the pedestrian signal read "don't walk" as Ochoa was turning. This informed him that at that point, the lights on eastbound Archer Ave. facing Gutierrez were red. The walk signal came on three seconds after the yellow arrow went off. According to Meth, he was alerted by the walk signal that eastbound traffic would have simultaneously received a green signal.

¶ 27                                    C. Closing Argument and the Jury's Verdict

¶ 28 During closing argument, Gutierrez argued that the lights were improperly programmed to operate, and that had Kozik done his inspection of the intersection properly, he would have discovered the error the night before the incident.

¶ 29 The City argued two theories in the alternative. First, it posited that Gutierrez had failed to prove the City was negligent because he had not shown that the City had actual or constructive notice of an unsafe lighting condition at the intersection. Second, it contended that it was not liable because the collision was the proximate result of Gutierrez's own negligence in bypassing stopped vehicles on eastbound Archer and approaching the intersection without stopping.

¶ 30 Gutierrez began his rebuttal argument by attempting to play the body-worn camera footage, but the City objected. During a sidebar, the trial court reminded Gutierrez that he was not allowed to argue any subsequent remedial measures or the malfunctioning or condition of the yellow arrow after the incident. Gutierrez argued that the footage had already been admitted into evidence and shows the light was functioning "wonky." The trial court agreed with the City and held that

Gutierrez was not allowed to argue any subsequent remedial measures or the functioning of the arrow after the fact.

¶ 31    In rebuttal, Gutierrez disputed the theory that he had been trying to "time" the light change, noting that the dash-cam footage showed that the walk signal on the south side of the intersection came on approximately three seconds before the collision, meaning that he had a green light for three seconds before entering the intersection.

¶ 32    After deliberations, the jury returned a general verdict for the City.

¶ 33                              D. Post-Trial Motion

¶ 34    In a post-trial motion, Gutierrez requested a new trial or in the alternative a judgment notwithstanding the verdict of the jury. He maintained that the trial court erred in allowing the City to amend its answer before the trial and in rendering several evidentiary rulings both before and during the trial. The trial court denied the motion.

¶ 35                              II.  ANALYSIS

¶ 36    Gutierrez contends that the trial court should have given him a new trial due to the trial court's prejudicial cumulative errors. Gutierrez contends the trial court erred in permitting the City to amend its answer and raise affirmative defenses based on the Tort Immunity Act. Furthermore, Gutierrez contends that the trial court erred in excluding or restricting evidence about the City's decision as to the timing of the traffic lights, the installation of the timing program for the lights, the lights' pre-accident inspections, and post-accident video footage of the accident scene. Gutierrez argues that the excluded evidence was strong circumstantial evidence that the City was negligent or could have determined who was at fault, and if multiple parties were, their respective faults.

¶ 37                    A.  Rulings on Immunity Defenses and Related Evidence

¶ 38    All but one of Gutierrez's arguments on appeal involve the City's assertions of immunity under the Tort Immunity Act. First, he argues that the trial court abused its discretion when it allowed the City to amend its answer to assert those defenses for the first time on the eve of trial.

He then argues that the trial court abused its discretion by excluding evidence of the City's negligence he intended to present at trial on the basis that the City was immune from suit based on those theories. We do not need to consider whether the court's rulings on these points were erroneous. Assuming they were, Gutierrez has not shown that he was prejudiced by them.

¶ 39 The "general verdict rule" is a legal principle that applies when the jury renders a general verdict on a case that involves multiple theories of liability or grounds of recovery. The principle is codified in statutory law:

> "If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." 735 ILCS 5/2-1201(d) (West 2016).

A general verdict will be upheld if there was sufficient evidence to sustain either theory, even if the record does not specify which theory the jury relied upon. *Blockmon v. McClellan*, 2019 IL App (1st) 180420, ¶ 21. Thus, the general verdict rule applies unless Gutierrez can show that the verdict was improper on "all of the theories of liability on which the jury's verdict might rest." *Id.*

¶ 40 Here, the City advanced two theories of nonliability. First, it argued that the City could not be held liable because it did not have any actual or constructive notice of any defect. Second, it argued that the accident was caused by Gutierrez's own negligence. Gutierrez challenges the jury's verdict based on purported cumulative errors that were detrimental to the trial's outcome. However, he fails to recognize that the exclusion of evidence that resulted from the City's belated assertion of defenses under the Tort Immunity Act only related to the issue of the City's purported

negligence. None of the excluded evidence spoke to whether *he* rebutted the evidence of his comparative negligence. And the evidence adduced at trial was sufficient to support a finding that Gutierrez's injuries were proximately caused by his own negligent conduct: several witnesses testified before the jury that Gutierrez rode along the curb to avoid several stopped cars, before the collision, and entered the intersection of Archer and Mayfield without stopping. Gutierrez was aware that two defense theories were presented; however, he did not submit any special interrogatories as to the proximate cause or request separate verdict forms specifying which theory or theories of nonliability the jury relied on. Consequently, we presume that the jury found in the City's favor as to both theories of nonliability, including Gutierrez's contributory negligence. He is therefore unable to show that he was prejudiced by the trial court's decisions to allow the City to assert new Tort Immunity Act defenses on the eve of trial or by its evidentiary rulings based on those defenses.

¶ 41                                    B. Excluded Evidence

¶ 42        Gutierrez also contends that the trial court made an error in its evidentiary rulings concerning the limitations on Gutierrez's ability to use the post-accident video footage. "A circuit court's evidentiary rulings regarding the admissibility of testimony and on a motion *in limine* are within its sound discretion and this court will not reverse such rulings unless the circuit court abused its discretion." *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23. When a ruling "is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court," it is an abuse of discretion. *People v. Caffey*, 205 Ill.2d 52, 89 (2001).

¶ 43        Gutierrez claims that the trial court erred when it limited his use of the body-worn camera footage from Weinert and Bos which depicted the traffic lights after the accident. Gutierrez argues that the trial court relied on its pretrial ruling barring evidence of subsequent remedial measures to prevent him from presenting the body-worn camera footage that had already been authenticated and admitted into evidence.[1]

_____

[1]    Gutierrez also notes that he was not permitted to use the footage and its audio to confront officers about discrepancies as either substantive evidence or impeachment, but he has forfeited this argument by not

- 10 -

¶ 44    We agree with Gutierrez that the facts shown by the body-worn camera footage—the operation of the traffic lights in the minutes after the incident—was not evidence that the City took remedial measures afterwards. Nevertheless, erroneous evidentiary rulings are only a basis for reversal if the error was "substantially prejudicial and affected the outcome of trial." *Ittersagen v. Advocate Health & Hospitals Corp.*, 2020 IL App (1st) 190778, ¶ 70. The burden for establishing prejudice rests on the party seeking reversal. *Id.* "An error is considered harmless when the jury would not have reached a different verdict because of the significant evidence presented." *Neuhengen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 156. In his reply brief, Gutierrez argues that the post occurrence videos would support his claim that "the timing of his green light simultaneous to the 'wonky' yellow arrow that continued to display." What they show is that, at the points in time where the yellow arrow is illuminated, the light for eastbound drivers on Archer was *red*, not green. As the footage would have contradicted Gutierrez's theory that he had a green light even while Ochoa had a yellow arrow, he was not prejudiced by the trial court's decision not to allow him to play it for the jury during closing argument. Additionally, was no prejudice because the footage was shown to the jury during trial. Therefore, there is no basis for reversal.

¶ 45                                  III.  CONCLUSION

¶ 46    For the foregoing reasons, we find that Gutierrez was not prejudiced by any of the trial court's alleged errors, so we affirm the judgment in favor of the City.

¶ 47    Affirmed.

---

supporting it with any citations to authority or reasons why the court's ruling was erroneous. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).